EL PUEBLO DE PUERTO RICO, apelado, *v.* JOSÉ R. ROMERO RODRÍGUEZ, acusado y apelante.

*Número:* CR-80-53      *Resuelto:* 31 de marzo de 1982

438

*Héctor A. Colón Cruz, Procurador General*, y *Josefa A. Román García, Procuradora General Auxiliar*, abogados del apelado; *Manuel Martínez Umpierre*, abogado del apelante.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

La prueba que mereció crédito al jurado, y en la que dispensó aparente benignidad al rebajar a segundo grado la acusación por asesinato, estableció que el apelante en concierto con otro, en carretera abierta tendió una emboscada a su víctima, un chófer de carro público en su trabajo de transportar pasajeros, atravesándole un camión de arrastre, persiguiéndolo cuando el chófer salió de su automóvil y trató de huir, y en dicha persecución rematándolo a tiros. El crimen compendia los elementos clásicos de acecho, designio y alevosía que integran el asesinato. El recurso de apelación descansa estrictamente en las cuestiones de derecho que pasamos a resolver.

I

Se queja el apelante de que el juez optó por juramentar diez jurados, posponiendo para el día siguiente el juramento definitivo de los dos restantes. No hubo error. El reclamo de perjuicio del acusado perdió toda legitimi-

dad cuando instado por el tribunal para que utilizara su reserva de 14 recusaciones perentorias contra los 10 jurados cualificados hasta ese momento, sólo utilizó una perentoria. De modo que se reservó 13 recusaciones para dos jurados que faltaban para completar el panel. No es este el caso en que se obliga a la defensa a agotar recusaciones perentorias que luego podrían hacerle falta para excluir candidatos llamados para cubrir las restantes plazas del panel. Índice adicional de la invalidez del señalamiento y total ausencia de perjuicio lo encontramos en la enmienda por Ley Núm. 60 de 27 mayo, 1980 de la Regla 123 de Procedimiento Criminal que redujo de 15 a 10 las recusaciones perentorias en asesinato igualándolas con las reservadas al Fiscal, aumentadas de 8 a 10. Si se cumple hoy el debido proceso con solo *10* perentorias a la defensa, ¿de qué puede quejarse quien en determinado momento del juicio tenía 13 perentorias que esgrimir faltando solo dos jurados para completar el panel?

## II

Es otro tanto insustancial la protesta del apelante por no haber el Fiscal puesto a su disposición declaraciones juradas de los testigos que ni figuraban al dorso de la acusación ni declararon en el juicio. La regla de *Pueblo* v. *Delgado López*, 106 D.P.R. 441, 444–445 (1977), en que busca apoyo la disidencia y que es norma de veinte años desde *Pueblo* v. *Ribas*, 83 D.P.R. 386 (1961), es que la defensa tiene derecho a examinar la declaración del testigo que declara, si es que dicho escrito está disponible. El acusado disfrutó ese derecho. En lo que concierne a declaraciones no producidas en el juicio, si es que se tomaron, no aparece que la defensa hiciera esfuerzo por examinarlas antes de juicio, ni mucho menos que en momento alguno haya planteado la materialidad o relevancia de las mismas a la defensa del acusado. En *United States* v. *Agurs*, 427 U.S. 97 (1976), se reafirma la

obligación del Fiscal de revelar prueba favorable al acusado, mas ¿quién ha señalado o reclamado que el Fiscal en este caso tenía esa prueba y la ocultó? Se requiere alguna demostración afirmativa de la existencia de esa prueba y no la serie de especulaciones que alimentan el argumento de la defensa. Así lo sostuvimos en el más reciente caso de *Pueblo* v. *Rodríguez Sánchez*, infra, porque el acusado no tiene derecho a una expedición de pesca en los archivos de fiscalía. No puede levantarse un castillo de precedentes en el aire, sin base racional en los autos, para imputar al Fiscal ocultación de prueba favorable al acusado. Si así fuere, con dicho error bastaría para revocar, sin necesidad de perseguir el efecto acumulativo de actuaciones perjudiciales al apelante.

Ya este Tribunal en decisión *per curiam*, se adhirió a la doctrina de *Brady* v. *Maryland*, 373 U.S. 83 (1963) y *United States* v. *Agurs*, supra, y sentó pauta en nuestra jurisdicción al resolver en *Pueblo* v. *Rodríguez Sánchez*, 109 D.P.R. 243, 246, 249 (1979):

> El descubrimiento de prueba que rebasa el texto de la Regla 95 y busca apoyo en el debido proceso de ley no es recurso a invocarse livianamente. Está muy lejos de ser patente de corso que en forma indiscriminada permita la intrusión en los archivos de fiscalía, ni que facilite al acusado cuanta evidencia pueda relacionarse con el caso criminal. *No basta para activar el remedio la probabilidad de que el jurado o el juez de conocer tal prueba hubiesen rendido un fallo distinto.* La protección constitucional se da en situación que implica corrupción de la función depuradora de la verdad que es la esencia procesal del juicio. [Énfasis nuestro.]
>
> .        .        .        .        .        .        .        .
>
> Reiteramos que no estamos dando licencia para que en todo caso y en forma automática se concedan todos los informes y papeles relacionados con la actuación del agente. El acusado que los solicita *debe hacer alguna demostración prima facie convincente de la materialidad de esa evidencia y de la legitimidad de su petición* que la excluyen de la

calificación de alegación simplemente dilatoria, onerosa y hostigante. [Énfasis nuestro.] *Cf. Pueblo* v. *Cancel Hernández,* 111 D.P.R. 625 (1981).

No hemos de pasar por alto que *Agurs,* supra, exige algo más que una solicitud de descubrimiento basada en inquietudes, preocupaciones o posibilidades académicas. Explícitamente requiere de la moción una demostración de base substancial de existencia de la prueba y de materialidad de la misma para la defensa. *Agurs,* supra, a la pág. 106. Allí se dijo: "[S]i la ocultación de evidencia resulta en error constitucional, ello se debe al carácter de la evidencia, no al carácter del fiscal." *Agurs,* pág. 98. "[L]a clave para el análisis del debido proceso en casos de alegada conducta impropia del fiscal es la objetividad del juicio y no la culpabilidad del acusador. . . . [E]l fin del debido proceso 'no es castigar a la sociedad por los desvíos del fiscal, sino evitar un juicio injusto para el acusado' [*Brady* v. *Maryland,* 373 U.S. 83 (1963)]". *Smith* v. *Phillips,* 455 U.S. 209, 219 (1982).

## III

En los señalamientos sobre evidencia de carácter la defensa tiene una posición ambivalente: objeta la intención del fiscal de presentar prueba sobre buen carácter de la víctima, y cuando el tribunal retira el testigo de reputación y elimina su testimonio la defensa también objeta. Consistente con esa estrategia acusa error en admitir y error en suprimir dicho testimonio. ¿Qué puede esto aportar al cúmulo de irregularidades de cuya suma total depende el apelante para revocar el veredicto del jurado? Es inconcebible que la estimación de la evidencia por el jurado dependa de que sus miembros sepan que hay una diferencia semántica entre prueba de "carácter" y prueba de "reputación". Usualmente son los hechos de alto relieve e impacto en la prueba, aquellos que captan y retienen el recuerdo del testigo, los que en consecuencia final inclinan el criterio del juzgador de hechos.

## IV

■ El apelante no objeta el contenido de la instrucción sobre fuga. Su inconformidad se limita al hecho de que por un olvido del juez hubo de darla aparte, al final, lo que pudo haberle insuflado, según él, énfasis perjudicial. El argumento pertenece a la provincia de lo imaginario. La disidencia, después de citar a *Hamling* v. *United States*, 418 U.S. 87 (1974), que le niega todo peso de error perjudicial aun a la discusión de la instrucción en presencia del jurado, se remite a "la posibilidad" de que tuviera "especial consideración en la mente del jurado". Si las instrucciones son correctas, parte de la deliberación por el jurado es darle *especial consideración* al relacionarlas con la prueba. Las instrucciones especiales pedidas por el Fiscal o la defensa, de aprobarlas el juez, se dan al final y en pieza aparte, y no vemos razón para especular que el jurado se inclinará a la última palabra y descartará el resto de la prueba. Un grado relativo de idoneidad en el jurado basta para excluir esta posibilidad.

## V

Dista mucho éste de ser el caso apropiado para aplicar la regla de efecto acumulativo de irregularidades procesales que daña el debido proceso. *Pueblo* v. *González Colón*, 110 D.P.R. 812, 831 (1981). No hay erosión perceptible, ni aislada ni en conjunto, de los derechos del acusado.

El apelante tuvo un proceso justo y un veredicto benigno. Esa es la sensación que fluye del examen del expediente, y que deja en paz la conciencia de sus juzgadores.

Con estos antecedentes y fundamentos la sentencia apelada es por la presente *confirmada*.

El Juez Asociado Señor Negrón García emitió opinión concurrente. El Juez Asociado Señor Irizarry Yunqué disintió con opinión a la que se une el Juez Presidente Señor Trías Monge.

—O—

Opinión disidente emitida por el Juez Asociado Señor Irizarry Yunqué a la que se une el Juez Presidente Señor Trías Monge.

Los hermanos Ángel y José Raúl Romero Rodríguez fueron acusados y juzgados conjuntamente en juicio por jurado por asesinato en primer grado y portación ilegal de un revólver en violación del Art. 8 de la Ley de Armas. El primero fue absuelto y contra el segundo, aquí apelante, recayó veredicto condenatorio por asesinato en segundo grado y por la portación imputada del arma. Fue sentenciado a penas de presidio de quince a treinta años y de tres a cinco años, respectivamente, a cumplirse concurrentemente la segunda con la primera. Alega en su recurso ante nos la comisión de numerosos errores e irregularidades ocurridos en el curso del juicio. A mi juicio se cometieron y, si bien cada uno aisladamente pudiera no ameritar la revocación del fallo recaído, su efecto acumulativo rebasa lo permisible y establece una desviación del debido proceso de ley reñida con las exigencias del derecho a un juicio justo.

Los hechos, según se desprenden del expediente ante nos y de la exposición narrativa de la prueba, son los siguientes: José Raúl Romero Rodríguez, aquí apelante, y Juan Méndez Méndez, el occiso, eran porteadores públicos en la ruta Arecibo-Camuy. Surgió entre ellos una polémica motivada por la afiliación de Méndez a una unión de chóferes de dicha ruta, y la no afiliación de Romero a la referida unión. Ello culminó en un encuentro personal entre ambos poco después del mediodía del 28 de febrero de 1980, en que se enfrentaron, Romero armado de un revólver y Méndez de un machete, produciéndose la muerte a tiros del segundo. Las teorías del fiscal y de la Defensa son resumidas en la exposición narrativa aprobada por el tribunal de instancia de la siguiente manera:

La teoría del Fiscal fue en el sentido de que el pasado 28 de febrero de 1980, a la 1:30 de la tarde, el apelante José Raúl Romero Rodríguez en unión a su hermano coacusado Ángel Romero Rodríguez estaba en el camión de arrastre de este último esperando al occiso Juan Méndez Méndez en la carretera número 119 como a 600 pies del garage que queda en la intersección con la carretera número dos, ya que el occiso en su ruta de chófer de carro público habría de pasar por ese lugar.

Cuando se acercó el occiso, quien venía en su vehículo con cinco pasajeros, el apelante y su hermano le cerraron el paso con el camión y lo det[uvieron]. Luego el señor José Raúl Romero le hace un disparo. El señor Juan Méndez Méndez saca un machete del baúl de su carro para defenderse. El señor Méndez se va a correr y Raúl Romero y Ángel Romero lo persiguen haciéndole varios disparos que le ocasionaron la muerte.

La teoría de la defensa fue en el sentido de que en ocasión de estar el señor José Raúl Romero reparando su automóvil en un garage de gasolina que queda en la intersección de las carreteras número dos y 119, jurisdicción de Hatillo, pasó su hermano Ángel en su camión de arrastre y José Raúl lo llamó para que se detuviera. Ángel se detuvo más adelante y José Raúl llegó hasta él. Estando ambos hablando allí, pasó el occiso en su vehículo público, se detuvo, insultó a José Raúl, trató de agredirlo con un machete y éste en su defensa tuvo que dispararle con un revólver.

Luego que ambas partes presentaron sus pruebas y de los incidentes que más adelante se refieren, el Jurado rindió los veredictos ya mencionados, por votación de nueve a tres. Los numerosos errores imputados al tribunal sentenciador pueden agruparse bajo los siguientes cuatro títulos: (1) desinsaculación del Jurado, (2) declaraciones en poder del fiscal, (3) prueba de reputación o del carácter del occiso, y (4) instrucciones al Jurado.

I

*Desinsaculación del Jurado*

En el proceso de desinsaculación del Jurado se han

seguido en la práctica dos métodos, que se han dado en llamar método corto y método largo. En el primero se va tomando juramento definitivo a los jurados al concluir cada ronda de desinsaculación. En el segundo se toma el juramento definitivo a todos los jurados al finalizar el proceso de desinsaculación.

En *Pueblo* v. *Munera*, 39 D.P.R. 295, 301 (1929), expresó este Tribunal su predilección por el segundo método, como más sencillo y mejor ajustado a una interpretación liberal del entonces vigente Art. 221 del Código de Enjuiciamiento Criminal de 1902 adoptado en las vigentes Reglas 118 y 119 de Procedimiento Criminal. Dijimos:

> El procedimiento más sencillo y que se ajusta mejor a la interpretación liberal del artículo 221 contenida en el caso de *El Pueblo* v. *Rivera, supra*, es el de insacular [*sic*] el número suficiente de jurados y tomarles el primer juramento. Acto seguido se procede a su examen y a las recusaciones motivadas. Luego a las perentorias. Si no hay recusaciones, se les toma el segundo juramento a todos. Si las hay, sin tomar el segundo juramento a los que queden, se insaculan [*sic*] nuevos y se sigue el mismo procedimiento. Cuando las partes aceptan finalmente el jurado o no hay más recusaciones motivadas y el número de las perentorias a que se tiene derecho se ha agotado, entonces se procede a tomar a todos los jurados a la vez el segundo juramento.

Nuestra predilección por este método fue reiterada en *Pueblo* v. *Torres*, 48 D.P.R. 39, 46 (1935), y en *Pueblo* v. *Morales*, 66 D.P.R. 10, 15 (1946), y cobra más actualidad bajo las Reglas de Procedimiento Criminal vigentes, que procuran dar mayor flexibilidad a los procedimientos, evitando "dilaciones y gastos injustificados". Véase la Regla 1. La práctica de tomar juramento definitivo cada vez que se completa una ronda de recusaciones necesariamente dilata y produce una indeseable rigidez en el proceso de desinsaculación.

El apelante imputa como error que el tribunal de

instancia, luego de iniciarse la desinsaculación mediante el método largo y cuando ya había habido seis rondas,(1) al finalizar el primer día del juicio, dispuso que se le tomara juramento definitivo a diez jurados que entonces había en el panel, para continuar el proceso al día siguiente. Hasta ese momento la estrategia de la Defensa, ajustada al método que se había estado utilizando, le daba la ventaja de que aún le restaban catorce recusaciones perentorias, mientras que al fiscal le quedaban solamente dos. El abogado del apelante objetó que se cambiara el método, anunciando que tenía intención de hacer uso de algunas de dichas recusaciones. El tribunal desestimó su planteamiento y le requirió que agotase en ese momento las recusaciones perentorias que se propusiere utilizar. La Defensa hizo uso de una recusación perentoria adicional y por sobre su objeción se le tomó juramento definitivo a los restantes jurados.

Hemos señalado que la selección entre los dos métodos —juramento definitivo parcial (corto) y juramento definitivo total (largo)— descansa en la sana discreción del tribunal de instancia. *Pueblo* v. *Vázquez*, 68 D.P.R. 67, 73 (1948), *Pueblo* v. *Torres*, supra. Pero, una vez se escoge un método y se inicia el procedimiento de desinsaculación a base de ese método, las partes tienen derecho a confiar en que éste no habrá de cambiarse por sobre su objeción. Las reglas de juego no deben alterarse en medio de la contienda, sobre todo cuando una parte ha adquirido una ventaja a base de su aplicación.

Desde hace casi un siglo expresó el Tribunal Supremo federal que la recusación perentoria de jurados desinsaculados es "uno de los derechos más importantes garantizados al acusado" en un juicio criminal. *Pointer* v. *United States*, 151 U.S. 396, 408 (1894). No implica un derecho a

---

(1) Usamos el término para significar cada vez que, luego de ser excusados algunos jurados mediante recusaciones de las partes, se desinsaculan nuevos jurados que les sustituyan hasta completar el grupo de doce.

seleccionar, sino un derecho a rechazar, fuera del control del tribunal. *Hayes* v. *Missouri*, 120 U.S. 68 (1887); *Spies* v. *Illinois*, 123 U.S. 131 (1887); *United States* v. *Carter*, 528 F.2d 844 (8th Cir. 1975), *certiorari* denegado, 425 U.S. 961 (1976). Requerir del acusado que ejerza sus recusaciones perentorias en determinado momento, no obstante que hasta entonces se había seguido una norma distinta, constituye error revisable. (²)

Tratar de determinar si el error cometido tuvo un efecto tan adverso a los intereses del apelante que por sí solo amerite la revocación nos colocaría en el campo de la especulación o la conjetura. Pero no puede pasarse por alto que al tomarse juramento definitivo a una gran mayoría del panel quedó trunca la opción que al día siguiente hubiese podido ejercitar la Defensa, en uso de las trece perentorias que le quedaban, de obtener cambios en la composición del jurado a base de otros jurados potenciales. El receso hasta el otro día propiciaba a la Defensa la oportunidad de investigar y estudiar mejor a los jurados ya desinsaculados y a aquellos cuyas cédulas o boletos aún permanecían en el saco. La continua investigación y estudio de los jurados es parte de la responsabilidad tanto del abogado defensor como del fiscal, para procurar que dicho Cuerpo se depure hasta el máximo posible de motivaciones, actitudes y prejuicios que puedan afectar el fin primordial de que se haga justicia.

## II

### Declaraciones en Poder del Fiscal

Aparece de los autos ante nos que en el curso de su investigación el fiscal había tomado declaraciones juradas

---

(²) En la fecha del juicio en instancia no estaba vigente la enmienda introducida a la Regla 123 de Procedimiento Criminal por la Ley Núm. 60 de 27 de mayo de 1980, que establece el mismo número de recusaciones perentorias para el acusado y para el fiscal. Este cambio hace más aconsejable aún que en la desinsaculación del jurado se utilice el método largo o de juramento definitivo al final.

a varias personas que no se hicieron figurar como testigos al dorso de la acusación. Ello fue admitido por el fiscal luego de terminar su turno de presentación de prueba, cuando a instancias de la Defensa el tribunal le requirió que informara si tenía tales declaraciones. El tribunal denegó entonces el pedido de la Defensa de que se pusieran dichas declaraciones a su disposición. El apelante señala que al así resolver, el tribunal incidió.

En *Pueblo* v. *Delgado López*, 106 D.P.R. 441, 444–445 (1977), señalamos que siendo el propósito del procedimiento judicial el esclarecimiento de la verdad, el fiscal tiene la obligación de poner a disposición del acusado aquella prueba que sea relevante a su defensa que esté disponible, se trate o no de declaraciones juradas.
Dijimos:

> El fiscal está en la obligación de poner a disposición del acusado aquella prueba que sea relevante a su defensa. *Pueblo* v. *Hernández García*, 102 D.P.R. 506, 510 (1974); *Pueblo* v. *Dones*, 102 D.P.R. 118 (1974). El interés principal del Estado en una causa criminal ". . . no es ganar un caso, sino que se haga justicia." *Berger* v. *United States*, 295 U.S. 78, 88 (1935), 79 L. Ed. 1314, 1321, citado en *Jencks*, supra, 353 U.S. 668, 1 L. Ed.2d 1112. "No se debe perder de vista que el objetivo de todo procedimiento judicial es el esclarecimiento de la verdad." *Pueblo* v. *Tribunal Superior*, 80 D.P.R. 702, 705 (1958). "Después de todo las cortes existen para derribar obstáculos en el camino hacia lo justo." *Pérez Cruz* v. *Fernández*, 101 D.P.R. 365, 377 (1973).

> Resolvemos que siempre que declare un testigo de cargo, o un testigo presentado por la defensa que hubiere sido renunciado por el fiscal —*Pueblo* v. *Díaz*, 86 D.P.R. 558 (1962)— la defensa tiene derecho a examinar cualquier escrito del testigo sobre el asunto que sea objeto de su testimonio que esté disponible en el momento en que declare y que no tenga carácter privilegiado, no importa que no fuese hecho bajo juramento o que no esté en posesión del ministerio público. Véanse: *Pueblo* v. *Tribunal Superior*, 96 D.P.R. 746 (1968) y *Pueblo* v. *Tribunal Superior*, 102 D.P.R. 470 (1974).

Este caso es el último de una serie que se inició con *Pueblo* v. *Ribas*, 83 D.P.R. 386 (1961), en que se cuestiona la llamada secretividad del expediente del fiscal una vez ésta pierde su fundamento y si ha de resultar en un obstáculo a que se haga justicia. Véanse los casos mencionados en la transcrita cita de *Pueblo* v. *Delgado López*, supra, y *Pueblo* v. *Quiñones Ramos*, 99 D.P.R. 1 (1970), *Pueblo* v. *Martínez Valentín*, 102 D.P.R. 492 (1974), y *Pueblo* v. *Beltrán Faría*, 102 D.P.R. 783 (1974) y *Pueblo* v. *Cancel Hernández*, supra.

De los autos ante nos se desprende que al detenerse el automóvil público conducido por Méndez Méndez y ocurrir los hechos de sangre que culminaron en su muerte, había en dicho vehículo cinco pasajeros. Es de presumirse que el fiscal investigador los examinara y les tomara declaraciones. Solamente uno fue incluido como testigo al dorso de la acusación. Sin embargo no fue utilizado por el fiscal, habiendo renunciado a su testimonio como prueba acumulativa. Fue utilizado por la Defensa. Quiénes eran esos otros pasajeros, qué vieron, cuán beneficioso sería su testimonio para sostener la teoría del apelante, ni se enteró de ello el juez que presidió el proceso ni surge de los autos. Todo ello yace bajo la pesada lápida de la secretividad del expediente del fiscal. No se ofreció explicación alguna para negar dicha información, excepto haberse invocado la protección de esa secretividad. No se adujo que dichas declaraciones sean privilegiadas, o que en nada beneficien a la Defensa. El ilustrado juez sentenciador no requirió se le mostraran para examinarlas. Los autos no revelan justificación para tal proceder. El procedimiento criminal no debe ser un juego de barajas en que se ocultan las cartas que no convienen.

En *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), al confirmar una decisión de la Corte de Apelaciones de Maryland, se expresó el Tribunal Supremo federal, por votación de seis a tres:

Resolvemos que la supresión por el fiscal, al serle requerida, de prueba favorable al acusado, viola el debido procedimiento si dicha prueba es pertinente a la culpabilidad o al castigo, independientemente de si el fiscal actúa de buena o de mala fe.

El alcance de esta norma se explicó en *Moore* v. *Illinois*, 408 U.S. 786, 794–795 (1972):

El corazón de la decisión en *Brady* es la supresión por el fiscal de prueba favorable al acusado, pertinente a la culpabilidad o al castigo, a pesar de haberle sido requerida. Son importantes, pues, (a) que haya supresión de prueba a pesar del requerimiento por la Defensa, (b) que dicha prueba sea de carácter favorable a la Defensa, y (c) que sea pertinente. Estas son las normas para medir la conducta del fiscal en el caso de Moore.

En *United States* v. *Agurs*, supra, se reafirman dichas decisiones y se expresa que no es necesario que la Defensa específicamente solicite determinada declaración. Basta que sea, en términos generales, prueba que pueda ser favorable al acusado y que, en vista de los hechos, de ser conocida por el jurado, pudo producir en ellos duda razonable. Esta decisión, por votación de siete a dos, en que los jueces Marshall y Brennan disintieron porque hubiesen ido más lejos que la mayoría, establece claramente que no se trata de una norma de descubrimiento de prueba, sino del derecho constitucional al debido procedimiento de ley bajo la Enmienda XIV.

En la página 106, se dijo:

En *Brady* el requerimiento fue específico. Informó al fiscal exactamente lo que la Defensa deseaba. Aunque el fiscal no tiene el deber, por supuesto, de proveer a la Defensa un descubrimiento ilimitado de todo lo que él sabe, si el asunto de tal requerimiento es pertinente o, más aún, si hay base substancial para reclamar su pertinencia, es razonable que se requiera al fiscal que responda, sea entregando la información o sometiendo el problema a la consideración del juez. Cuando el fiscal recibe un requerimiento específico y pertinente, su denegatoria es pocas veces, si alguna, excusable.

Más adelante, pág. 107 *in fine*, expresa el Tribunal que el deber del fiscal de suministrar información pertinente a la Defensa puede surgir antes del juicio o durante el juicio y que, "un fiscal prudente resolverá la cuestión, si en duda, a favor de hacer su revelación". Pág. 108. Señaló el Tribunal: "Porque si bien el abogado del soberano debe llevar el caso contra el acusado con fervor y vigor, tiene siempre que ser leal al interés primordial de su cliente de que 'se haga justicia'. Él es 'el servidor de la ley, cuyo doble propósito es que no escape el culpable o pague el inocente'. *Berger* v. *United States*, 295 U.S. 78, 88 [1935, 79 L.E. 1314, 55 S. Ct. 629]. Esta descripción del deber del fiscal elimina la norma de pertinencia que gobierna su obligación de revelar prueba exculpatoria." Pág. 111. El juicio criminal no puede ser una contienda o debate en que el fin último sea vencer al adversario. Si así fuera, el propósito esencialísimo de que se haga justicia estaría a merced de las argucias de los abogados y fiscales. Tal cosa tiene que desalentarse con todas las fuerzas del espíritu.

La base o *test* para determinar la pertinencia (*materiality*) de la información, la expresa el Tribunal así (pág. 112):

La norma adecuada sobre pertinencia deberá reflejar nuestro interés en que el fallo condenatorio sea justo. Tal fallo es permisible únicamente cuando está sostenido por prueba que establece la culpabilidad más allá de duda razonable. Esto necesariamente conduce a que si la prueba omitida crea duda razonable que de otra suerte no existía, se ha cometido un error de naturaleza constitucional. Quiere esto decir que la omisión debe evaluarse en el contexto de todo el récord. Si no hay duda razonable sobre culpabilidad, considerada o no la prueba suprimida, no se justifica ordenar un nuevo juicio. Por otro lado, si el veredicto es de validez cuestionable, prueba omitida que parezca ser de relativa poca importancia podría ser suficiente para crear duda razonable.

Los autos no revelan el contenido de las declaraciones que el fiscal se negó a producir. Sería una candidez pensar

que dichas declaraciones son inofensivas para la teoría del fiscal. Es inquietante que de cinco pasajeros que viajaban con el señor Méndez Méndez, solamente uno se incluya como testigo de cargo, y que resultara a la postre ser testigo de Defensa. La teoría del fiscal colocó al apelante como el agresor que avanzó hacia el carro del occiso y le disparó sin más provocación. De ser esto cierto, debieron verlo esos pasajeros. Por otro lado, la teoría de la Defensa señaló al occiso como el agresor, armado de un machete. El veredicto del Jurado exoneró al hermano del apelante y rebajó la calificación del delito a asesinato en segundo grado. ¿Pudo la prueba suprimida justificar un veredicto menor, o aun la absolución, a base de crear duda razonable? Solamente conociendo esos testimonios podríamos aproximarnos a dar una contestación.

El Procurador General argumenta, *inter alia*, que el requerimiento hecho por la Defensa fue tardío. Pasa por alto que, como se dijo en *Agurs*, y su progenie, no se trata de descubrimiento de prueba y sí de debido procedimiento de ley constitucional y por tanto el planteamiento puede hacerse antes o durante el juicio. Aun si se tratase de descubrimiento de prueba, por disposición expresa de la Regla 95 de Procedimiento Criminal, el descubrimiento antes del juicio no alcanza a declaraciones juradas en poder del fiscal.(3) Quizás no sea este el momento de pasar juicio sobre dicha regla. Adviértase que no es hasta la etapa del juicio cuando se revela toda la estrategia y la

_____

(3) Dicha regla dispone:

"Previa moción del acusado sometida en cualquier momento después de haberse presentado la acusación, el tribunal podrá ordenar al fiscal que produzca para ser inspeccionados, copiados o fotografiados por el acusado o su abogado, determinados objetos, libros, documentos y papeles que no fueren declaraciones juradas, con excepción de la declaración del propio acusado, que el Pueblo hubiese obtenido del acusado o de otras personas mediante orden judicial o de otro modo y que pudieren ser necesarios para la preparación de la defensa del acusado, independientemente de que el Pueblo se propusiere ofrecerlos en evidencia o de que los mismos fueren admisibles en evidencia. La orden especificará el tiempo, lugar y manera de hacer la inspección, de sacar las copias o tomar las fotografías y podrá prescribir los términos y condiciones que el tribunal estimare justos."

prueba del fiscal. Ya para entonces la secretividad de su expediente ha perdido su justificación, salvo para el caso de materia privilegiada, la protección de la identidad de personas, etc., asuntos sobre los cuales corresponde decidir no al fiscal, sino al tribunal, siempre teniendo presente que se haga cumplida justicia.

En resumen, el fiscal, como servidor de la justicia, tiene la obligación de revelar, a solicitud de la Defensa y luego de sometido el caso del Pueblo, toda aquella prueba que le esté accesible y que pueda ser favorable a la Defensa, salvo cuando existieren razones que justificaren, a juicio del tribunal luego de conocer la misma, que dicha prueba no se revele.

## III

*Prueba de Reputación o Carácter del Occiso*

Una vez que la Defensa hubo presentado su prueba, el fiscal indicó al tribunal, en ausencia del jurado, que se proponía presentar prueba bajo la Regla 20(A)(5) de Evidencia. Ésta dispone:

Regla 20. **Evidencia de carácter y hábito**

(A) Evidencia del carácter de una persona o de un rasgo de su carácter no es admisible cuando se ofrece para probar que en una ocasión específica la persona actuó de conformidad con tal carácter, excepto:

.    .    .    .    .    .    .    .

(5) Si la evidencia es ofrecida por el ministerio fiscal en relación al carácter tranquilo o pacífico de la víctima en un caso de asesinato u homicidio, para rebatir evidencia de que la víctima fue el primer agresor.

La Defensa se opuso a que el fiscal presentara dicha prueba y luego de argumentarse sobre ello por ambas partes, el tribunal desestimó la objeción y resolvió que la prueba era admisible. Como se recordará, la prueba de defensa pretendió establecer que la víctima fue el primer

agresor. No obstante, al regresar a sala el jurado el juez les anunció, motu proprio que el fiscal presentaría prueba sobre la "buena reputación del occiso". De inmediato el fiscal llamó a declarar al testigo Félix Soto Abreu y a preguntas suyas éste expresó "que conoció al occiso Juan Méndez Méndez y que éste era una divina persona, humilde y de buena reputación en la comunidad". Nada declaró sobre su carácter tranquilo o pacífico.

El abogado del apelante inició su contrainterrogatorio pretendiendo demostrar el interés del testigo. El juez, sin que mediara objeción del fiscal, detuvo el contrainterrogatorio y ordenó la eliminación del testimonio. No permitió que la Defensa continuara el contrainterrogatorio a pesar de su solicitud al efecto, disponiendo que si lo interesaba podía utilizar al testigo como testigo de defensa, a lo que no accedió el abogado del apelante. En torno a este incidente plantea que se cometieron cuatro errores, a saber, permitir al fiscal presentar prueba de reputación del occiso sin que la Defensa hubiera puesto su reputación en controversia, tomarse la iniciativa el juez de anunciar al Jurado que se ofrecería dicha prueba, detener motu proprio el contrainterrogatorio, y no permitir que éste continuara.

La citada Regla 20(A) dispone como norma que no es admisible prueba del *carácter* de una persona para demostrar que en determinado momento actuara de conformidad con tal carácter. Por excepción, bajo su inciso 5 es admisible prueba del carácter tranquilo o pacífico de la víctima en un caso de asesinato u homicidio, si está en controversia si la víctima fue el primer agresor.

Prueba del carácter de una persona puede ser admisible bajo dos supuestos distintos: primero, si el carácter es un hecho en controversia en el litigio, [4] o segundo, como prueba circunstancial para demostrar que debido a tal o

---

[4] En inglés se le llama *an ultimate issue in the case*. McCormick, *On Evidence*, 2da ed., pág. 442.

cual carácter de la persona puede inferirse si incurrió o no en determinada conducta. La norma establecida en el citado inciso 5 se enmarca en este segundo supuesto. La admisibilidad de esa prueba no es la regla; es la excepción y debe aplicarse con cautela, pues dicha prueba "viene acompañada con demasiado equipaje peligroso de prejuicio, de distracción del verdadero *issue*, de inversión de tiempo, y de riesgo de producir sorpresas". McCormick, *On Evidence*, 2da ed., pág. 445; Jones, *On Evidence*, 1972, Sec. 4.44. Se puede prestar a que el juzgador de los hechos desvíe su atención del verdadero propósito de tal prueba y actúe movido por sus sentimientos particulares de piedad o de venganza, o por sus particulares prejuicios. McCormick, *op. cit.*, pág. 461.

En el presente caso el tribunal de instancia confundió de primera intención los conceptos prueba del carácter de la víctima a los fines de la citada Regla 20 con prueba de su buena reputación, y cometió el error de indicarle al Jurado que el fiscal ofrecería prueba "de la buena reputación del occiso". Pasó por alto que la reputación, en forma de opinión, es una manera de probar el carácter, pero que ambos términos no son sinónimos. Bajo el inciso U de la Regla 65 de Evidencia, es admisible prueba "de la reputación en la comunidad en que reside una persona o entre un grupo con el cual la persona se asocia, sobre el carácter, o un rasgo particular del carácter de dicha persona". Aquí, la única prueba de carácter admisible era sobre "[el] carácter tranquilo o pacífico de la víctima", Regla 20(A)(5), no sobre su reputación en general ni sobre su carácter en general.

El tribunal rectificó una vez se inició el contrainterrogatorio. Debió hacerlo tan pronto se produjo la prueba sobre la buena reputación general de la víctima, asunto que no estaba en controversia. Cuán perjudicial pudo ser el error, rebasa toda posible especulación. No podemos presumir susceptibilidades en el Jurado. *Pueblo* v. *Dones*

*Arroyo,* 106 D.P.R. 303, 311 (1977). Pero aquí, aparte de permitirse prueba inadmisible, el anuncio de que sería presentada fue hecho por el propio juez, adicionando con ello un detalle acumulativo en el peso de dicha prueba. Añádase a ello que la adjudicación del hecho en controversia —quién fue el primer agresor— dependía de la credibilidad que al Jurado merecieran los testigos de una y otra parte. La información que el juez adelantó al Jurado sobre la prueba a ofrecerse por el fiscal de la "buena reputación del occiso" no puede catalogarse como una "intervención discreta para el mejor entendimiento de la prueba", como dijéramos en *Pueblo* v. *Cuevas Toledo,* 89 D.P.R. 163, 167–168 (1963). Nada confuso había que ameritase apartarse de la mejor práctica de "dejar que la narración y enumeración de los detalles del suceso surja espontáneamente del interrogatorio [del] fiscal y el interrogatorio de la defensa . . .". *Pueblo* v. *Cuevas Toledo,* supra, pág. 167. Se cometieron los errores imputados.

IV

*Instrucciones al Jurado*

El apelante señala varias irregularidades sobre la forma en que se impartieron las instrucciones al Jurado en violación a la Regla 137 de Procedimiento Criminal. Dicha Regla exige que las objeciones a las instrucciones al Jurado se discutan fuera de la presencia del Jurado. En este caso se violó la regla, pues se discutió la procedencia o no de la instrucción sobre fuga solicitada por el Ministerio Fiscal estando el Jurado presente. Después de discutida, el juez la permitió.

En el ámbito federal se ha rechazado aplicar de forma mecánica la Regla 30 de Procedimiento Criminal federal, equivalente a nuestra Regla 137, al considerar variaciones o errores cometidos en el juicio en conflicto con lo requerido por ella. El caso normativo es *Hamling* v. *United States,* 418 U.S. 87 (1974), en que el Tribunal

Supremo federal expresamente resolvió que el mero hecho de que se haya discutido frente al Jurado una objeción a las instrucciones no justifica per se ordenar un nuevo juicio. Señala dicho caso que la razón de requerir que se discutan las objeciones fuera de la presencia del Jurado es la siguiente:

Los tribunales, al examinar la Regla, han encontrado que ha sido principalmente diseñada para evitar las sutiles presiones sicológicas que surgirían sobre los jurados si tuvieran que ver y escuchar al abogado de la Defensa en una posición de antagonismo aparente hacia el juez. *Lovely* v. *United States*, [169 F.2d 386 (1948)], a la pág. 391; *Hodges* v. *United States*, [243 F.2d 281 (1957)], a las págs. 283–284; *United States* v. *Schartner*, [426 F.2d 470 (1970)], a la pág. 479. Si bien esta meta puede ser obtenida en muchos casos con una conferencia en voz baja en el estrado, la mejor manera de conseguir la meta es cumplir con la Regla. (Traducción nuestra.) Pág. 134.

Plantea, además, el apelante que el juez dio la instrucción sobre fuga después de haber impartido las instrucciones al Jurado. El juez había determinado con anterioridad que procedía dicha instrucción y por omisión no la dio cuando impartió las instrucciones. Alega el apelante que dicha irregularidad le perjudicó, pues resaltó dicha instrucción sobre las otras. Si bien en las instrucciones generales se explica que el Jurado no deberá destacar una instrucción en particular y que deberá considerar todas las instrucciones en conjunto y en su totalidad, [5] no podemos abstraernos a la posibilidad de que la instrucción sobre fuga, dada luego de discutirse su procedencia ante el Jurado y habiendo sido impartida aisladamente, después de las generales, tuviera el efecto de ser destacada y tener especial consideración en la mente del Jurado. Ante una prueba conflictiva como la que tenía ante sí, ese hecho pudo tener especial peso en el veredicto condenatorio.

[5] Véase el manual de *Instrucciones al Jurado para el Tribunal Superior de Puerto Rico*, 1976, pág. 4.

## V

*Resumen*

Concluye este Tribunal, tomando cada uno de los errores alegados separadamente de los demás, que ninguno amerita revocar los fallos condenatorios. Al así resolver se parte de un supuesto: que ninguno fue perjudicial. Tal determinación es una arriesgada conjetura. ¿Cómo se puede estar seguro de que esos errores o alguno de ellos no influyeron para inclinar la balanza, durante la deliberación del Jurado, en contra del acusado? No podemos ignorar el efecto acumulativo, perjudicial a un juicio justo, de la totalidad de dichos errores frente a la prueba que fuera aportada por ambas partes. Dijimos en *Pueblo v. González Colón*, 110 D.P.R. 812, 831 (1981):

> En ocasiones se incurre en error aislado cuya carga de erosión de las garantías constitucionales o estatutarias no produce necesariamente el colapso del trato justo y de acuerdo a la ley que es signo del juicio criminal. Mas la reiteración de ese tipo de error tiene el efecto acumulativo de enervar el amplio espectro de legalidad, el nervio central de debido proceso sobre el cual descansan la sentencia y la facultad moral y ética para quitar la libertad a un ciudadano. Por el efecto acumulativo de la reiteración, aun de errores disímiles, el error aislado no-perjudicial adquiere proporción y relieve de error que transgrede las garantías básicas y requiere la anulación del juicio.

Por los fundamentos expresados, revocaría las sentencias apeladas y ordenaría la celebración de un nuevo juicio.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

En el proceso previo de formar conciencia judicial para concurrir con el dictamen confirmatorio hemos evaluado cuidadosamente las distintas avenidas, incluso la propuesta de nuevo juicio. Ello ha requerido un esmerado examen de

los autos, alegatos y prueba. Nuestro voto ha respondido a las siguientes consideraciones.

## I

*Desinsaculación del Jurado*

La preferencia jurisprudencial sobre el método largo de desinsacular un jurado, frente al corto, la combinación de ambos y la observancia mixta de uno u otro, no puede significar ni tener, por *sí solo*, el alcance de un error perjudicial. Sin violar el balance de las partes, debe auspiciarse aquel que imprima mayor rapidez a los procedimientos. (Véase Ley Núm. 89 de 26 de junio de 1974, enmendatoria de la Regla 119 de Procedimiento Criminal, que autoriza a los jueces a formular inicialmente preguntas pertinentes al Jurado relativas a su capacidad de actuar.)

Independientemente de lo expuesto: (1) el apelante no nos ha demostrado —aparte de que teóricamente le quedaban catorce (14) recusaciones perentorias— cómo ello afectó el dictamen del Jurado. Requerido que las agotase, sólo usó una (1). El tribunal de instancia, luego de informarle y requerirle que las utilizara recesó esa tarde, y al otro día *aparentemente* la Defensa renunció ([1]) a su planteamiento. Adviértase, además, que no nos ha podido hacer un solo señalamiento en cuanto a la capacidad e idoneidad del Jurado que lo juzgó. Como cuestión de hecho, por estipulación aceptó el jurado número 11, aunque pasaba los 70 años, y también el número 12. (E.N.P., pág. 4.)

## II

*Declaraciones en Poder del Fiscal*

El apelante limitó su apelación a errores de *derecho*. Por lo tanto, no perfeccionó su recurso con una Exposición

---

([1]) La minuta del 27 de agosto de 1980 (Libro Núm. 56, Apéndice 2, pág. 17) consigna que luego de un receso, "la defensa renuncia a su planteamiento".

Narrativa de Prueba sobre el contenido de los testimonios de los testigos. Notamos que de los diecisiete (17) testigos al dorso de la acusación el fiscal sólo usó cinco (5), a saber: *Elvit Pellot Vargas*, operador de equipo pesado, que se desempeñaba cerca del lugar de los hechos; *William Hernández Pérez*, conductor de vehículo público, quien llegó mientras se desarrollaban los hechos; *Dr. José A. Carro*, patólogo que practicó la autopsia, y los agentes de la Policía *Franklyn Amador* y *Luis V. Herrera*. Los restantes testigos fueron renunciados y puestos a disposición de la Defensa. Ésta recibió, además, las declaraciones juradas de ellos y usó a Nancy Pagán Rodríguez, pasajera en el auto del occiso, y a William Candelaria Torres. Además el testimonio del propio apelante José R. Romero Rodríguez. Subsiguientemente *renunció* a cuatro (4) testigos que estaban bajo las reglas, los cuales fueron puestos a disposición del Ministerio Fiscal y no fueron llamados a declarar.

Desconociendo este Tribunal el contenido y carácter de la prueba testifical desfilada —por haber optado el apelante no certificar la exposición narrativa sobre estos extremos— resultaría peligroso resolverlo a base de la *no* desfilada. Nos parece un tanto especulativo y arriesgado ese curso de acción. La evaluación del señalamiento de que el fiscal debió suministrar todas las declaraciones juradas de personas anónimas que existieran requería algo más de su parte, a saber, la posibilidad de que tuviera algún mérito la defensa propia. ¿Por qué entonces ordenar un nuevo juicio, sin tener los elementos de juicio para preliminarmente examinar su potencial de beneficio o perjuicio para el apelante? No nos resignamos a impartir justicia a ciegas.

## III

*Prueba de Reputación o Carácter del Occiso*

Con respecto al incidente del testigo Félix Soto Abreu

presentado por el fiscal para demostrar "la buena reputación del occiso" el tribunal no sólo rectificó su criterio original erróneo de admitirlo, sino que, además, ordenó su eliminación e *instruyó al Jurado que no debería tomarlo en consideración.* ¿Podemos entonces concluir que se cometió un error sustantivo? No lo creemos.

## IV

*Instrucciones al Jurado*

Finalmente, no podemos compartir su tesis relativa a la instrucción *separada* sobre *fuga* brindada después de terminar las anteriores, a base de que se destacara perjudicialmente esa conducta, pudiendo tener efectos especiales negativos en la mente del Jurado. Nos preocupa refrendar esa teoría y su impacto en el procedimiento criminal, pues: (1) ello implicaría que nunca podría corregirse en el acto del juicio una omisión de esta naturaleza; (2) advertimos que *después* de esa instrucción, se brindó las relacionadas con *veredictos posibles.* Si algún efecto tuvo la instrucción separada de fuga, se diluyó por la posterior, ya que el jurado rindió veredicto reducido de asesinato en primer grado a segundo.

Lo expuesto nos mueve a sostener y confirmar las sentencias. Correspondía al apelante —y no lo hizo— proveernos los elementos de juicio para integralmente apreciar el alcance de sus planteamientos de derecho en relación con la prueba. La elaborada y respetable ponencia disidente se fundamenta precisamente en atribuirle unos efectos al trámite, sin el beneficio de medirlos bajo la óptica de la prueba. Explorar algunas dimensiones de la prueba nos hubiese permitido concretizar con certeza el verdadero alcance perjudicial, si alguno, de los errores atribuidos al foro sentenciador.

En todo caso nuestra función básica es descargar y hacer justicia con conciencia y sujeción a nuestras limitaciones inherentes humanas. El apelante no nos ha auxilia-

do en esa tarea. ¿Por qué, para cumplir con nuestra delicada encomienda, no tuvimos: (1) la exposición narrativa de la prueba testifical; (2) el protocolo de autopsia o testimonio pericial, para detectar por qué parte del cuerpo penetraron las balas —frente, lado o atrás—; y (3) copia de las declaraciones juradas que el fiscal entregó de sus testigos renunciados?

Ello nos hubiese permitido evaluar los siguientes aspectos pertinentes a la *teoría de defensa propia:* ¿fueron heridos el apelante y su hermano? ¿Hasta dónde y cómo persiguió al occiso? ¿Cuántas heridas de bala y su punto de penetración mostraba el cuerpo de la víctima? ¿Cuántas balas fueron disparadas?

## V

*Conclusión*

Recapitulando, el apelante discute la comisión de errores referentes al trámite y encausamiento. Curiosamente no cuestiona la *suficiencia* y calidad de la prueba desfilada. No nos ha hecho el clásico señalamiento de que la prueba resultó insuficiente en derecho para sostener su convicción. El éxito de su apelación ha dependido de unos errores aislados, de índole procesal, a saber: la selección del Jurado; la posibilidad de que exista prueba exculpatoria; y que el juez no debió en *tiempo* corregir sus errores sobre la admisibilidad del testimonio de reputación y la omisión de brindar la instrucción de fuga.

Ante el Jurado no prevaleció la teoría de defensa propia. Por el contrario, el Jurado creyó que la víctima fue emboscada por el apelante y que no fue ella la que originó el incidente fatal. Aunque no es imposible, es cuestionable que la víctima —que discurría y transportaba pasajeros en su vehículo— extemporáneamente detuviera a propósito su vehículo, se bajara con un machete y atacara a dos personas adultas. De ordinario, tales riesgos no se corren

sin que exista un incidente del momento. La balanza se inclina contra la teoría de defensa propia.

Reconocer en estas circunstancias un nuevo juicio sin los elementos de prueba, no es justicia cabal.