ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br>Apelado<br><br>v.<br><br>DANIEL VÉLEZ VÉLEZ<br>Apelante | KLAN202400210 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Criminal Núm. ISCR202201194-1199<br><br>Sobre:<br>Ley 54 |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Rodríguez Flores.

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de mayo de 2025.

Comparece ante nos el Sr. Daniel Vélez Vélez (apelante o señor Vélez Vélez) y solicita que revoquemos la *Sentencia* que dictó el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI o foro primario), el 5 de febrero de 2024. Mediante juicio por jurado, el apelante fue hallado culpable por infringir los Artículos 3.3 (maltrato mediante amenaza), 3.5 (agresión sexual conyugal) y 3.5 en la modalidad de tentativa, todos de la Ley Núm. 54 de 15 de agosto de 1989, mejor conocida como la *Ley para la Prevención e Intervención con la Violencia Doméstica, infra.* Además, se le halló culpable por dos cargos del Artículo 6.05 (portación, transportación o uso de armas de fuego sin licencia) y un cargo del Artículo 6.14 (b) (disparar o apuntar armas de fuego) de la Ley Núm. 168-2019, mejor conocida como la *Ley de Armas de Puerto Rico de 2020, infra.*

Por los fundamentos que exponemos a continuación, se confirma la sentencia apelada.

**I.**

Por hechos ocurridos en diciembre de 2021 y el 11 de mayo de 2022, el Ministerio Público presentó acusaciones en contra del

señor Vélez Vélez por cometer agresión sexual conyugal; tentativa de agresión sexual; portación de arma de fuego sin licencia, y apuntar con un arma de fuego, contra su pareja consensual, la Sra. Yazmin Enid Rivera Alequín (señora Rivera Alequín). El juicio fue celebrado ante un jurado durante los días 4, 5 y 6 de diciembre de 2023.

La prueba de cargo presentada por el Ministerio Público durante el juicio consistió en los testimonios de las Agtes. Dorisa Cancel Pérez e Ivelisse Rosado Arroyo, el Sr. Ricardo Luis Ayala Guzmán, el Tnte. Wilfredo Soto Martínez, el Agte. Emilio Martínez Miranda y la señora Rivera Alequín, así como prueba documental.[1]

A continuación, resumimos los aspectos relevantes de los testimonios de los seis (6) testigos del Ministerio Público.

### Agente Dorisa Cancel Pérez (agente Cancel Pérez)

El desfile de prueba comenzó con el testimonio de la agente Cancel Pérez. Declaró que labora en el Registro de Armas del Distrito de Mayagüez de la Policía de Puerto Rico. A solicitud de la agente Ivelisse Rosado Arroyo, la agente Cancel realizó una búsqueda en el sistema electrónico del registro con el nombre y seguro social de Daniel Vélez Vélez y esta no dio resultados.[2] Durante su testimonio, el TPI admitió como prueba una certificación negativa de portación de armas realizada con el nombre del señor Vélez Vélez.[3]

### Agente Ivelisse Rosado Arroyo (agente Rosado Arroyo)

La agente Rosado Arroyo laboraba en la División de Violencia Doméstica de la Policía de Puerto Rico en Mayagüez y fue la encargada de investigar la querella contra el apelante. El 11 de mayo

---

[1] El Ministerio Público presentó la siguiente prueba documental en el juicio:

> Exhibit 1: Consulta de Ciudadanos del Registro de Armas (1 folio).
> Exhibit 2: Informe de Investigación de violencia doméstica (4 folios).
> Exhibit 3: PPR 621.5: Informe de violencia (2 folios).
> Exhibit 4: Planilla informativa (1 folio).

[2] Transcripción de la prueba oral (TPO), pág. 4, líneas 15-27; pág. 9, líneas 7-9.
[3] *Íd.* pág. 5, líneas 1-5, 13-22; pág. 6, línea 2.

de 2022 a las 2:30 pm recibió una llamada de una intercesora legal sobre una perjudicada que solicitaba ayuda. Le entregó su teléfono celular al retén del área de Fiscalía donde se encontraba trabajando otro caso. Ello, para que procediera a ubicar patrullas de Mayagüez para darle auxilio a una presunta víctima. La agente continuó atendiendo el otro caso y luego le informaron que la presunta víctima de este caso la tenían en un lugar seguro.

Narró que, el 13 de mayo de 2022, se reunió con la señora Rivera Alequín quien le relató parte de lo sucedido el 11 de mayo de 2022.[4] Señaló que la perjudicada recibió una llamada de su pareja consensual a las 12 de la medianoche.[5] Detalló que este le preguntó dónde estaba y qué hacía; cuando ella le contestó que se encontraba durmiendo en su apartamento, él le instruyó a que le abriera la puerta; la perjudicada accedió y lo dejó pasar.[6] Continuó diciendo que el apelante comenzó a reclamarle sobre unas fotos en su teléfono celular y ella le contestó que eran viejas e irrelevantes.[7] Narró que la señora Rivera Alequín le puntualizó que, acto seguido, el señor Vélez Vélez le expresó que quería tener intimidad con ella y le ordenó a que se fuera a bañar.[8] Se asustó y se fue a bañar. Llega a la habitación y el apelante se encuentra en la habitación con un arma de fuego. Ella relató que en todo momento sabe y se percata que tiene un arma de fuego.[9]

Asimismo, la agente expresó que la señora Rivera Alequín le informó que, el arma de fuego era "negra y pequeña" y él lo tenía debajo de su brazo, y que esto la asustó.[10] Además, que la perjudicada le indicó que continuaron las discusiones. Él comienza a reclamarle sobre qué tipo de relaciones tenía con parejas

---

[4] *Íd.* pág. 26, líneas 5-7.
[5] *Íd.* líneas 20-23.
[6] *Íd.* líneas 24-29.
[7] *Íd.* pág. 26, líneas 29-31; pág. 27, línea 1.
[8] *Íd.* pág. 27, líneas 1-3.
[9] *Íd.* pág. 27, líneas 12-18.
[10] *Íd.* líneas 5-6.

pasadas.[11] Le dijo que él se torna más agresivo. Él le indica que van a tener relaciones pero que si no lo complace la iba a matar. Ella dice que estaba asustada. El apelante le dijo que si no era de él no es de nadie, que, si no, mejor la mataría. También dijo que él iba a quitarse su vida. Ella indicó que trató de mantener la calma porque tenía dos niñas en el apartamento.[12]

La agente Rosado Arroyo expresó que la señora Rivera Alequín no pudo llevar a sus hijas a la escuela porque el señor Vélez Vélez seguía en su apartamento, pero sí se despidió de ellas por la mañana pensando que él la iba a matar, pensando que iba a morir.[13] Se quedó en el apartamento bajo temor. La señora Rivera Alequín expresó que se bañó y tuvo intimidad con el apelante sintiéndose atemorizada porque este portaba un arma de fuego. Después el apelante se retiró del apartamento.[14] La agente continuó su testimonio al narrar que, la señora Rivera Alequín le informó que por la tarde salió por la puerta trasera de su hogar para buscar a las niñas a las diferentes escuelas donde se encontraban. Se comunicó con su madre para pedirle ayuda, porque ella no puede regresar al apartamento porque teme por su vida, por su seguridad y por la seguridad de sus hijas.[15] Mientras hacía esto, recibió una llamada del apelante en la que este le procuró su localización.[16]

La agente informó que percibió a la señora Rivera Alequín, nerviosa, atemorizada. Dijo, "prácticamente el miedo le estaba completamente atemorizado. Eh le dimos su espacio, lógicamente."[17] Indicó que esta relató los hechos paulatinamente durante la tarde del 13 de mayo de 2022 y ella cuando se acordaba de algún suceso, lo expresaba, llorosa. Ya en horas de la tarde

---

[11] *Íd.* pág. 27, líneas 17-19.
[12] *Íd.* líneas 17-23.
[13] *Íd.* líneas 21 y 23; pág. 29, líneas 4-6. pág. 30 líneas 1-6.
[14] *Íd.* pág. 29, líneas 9-11.
[15] *Íd.* líneas 12-15.
[16] *Íd.* pág. 31, líneas 21-22 y 24.
[17] *Íd.* pág. 32, líneas 9-11.

fueron a Fiscalía de Mayagüez para la entrevista con el fiscal, presenciada también por la agente.[18] En esta entrevista, la señora Rivera Alequín comenzó a sentirse con más confianza porque se sentía apoyada y expresó todo lo que estaba viviendo. Ella expresó que, sufrió una agresión sexual por parte de su pareja, el apelante, quien portaba un arma de fuego en todo momento.[19]

Durante el testimonio de la agente Rosado Arroyo se admitió el informe de investigación,[20] así como el informe de violencia, también conocido como planilla informativa o PPR 621.5.[21] Además, expresó que el teléfono celular de la señora Rivera Alequín fue analizado por la División de Crímenes Cibernéticos, pero no surgió información particular de esto, razón por la que no se hizo constar en el expediente.[22]

En adición, puntualizó que la primera persona que investigó los hechos fue el agente Emilio Martínez Miranda, a quien entrevistó sin hacerlo constar en el expediente.[23] Expresó que fueron al Residencial Yagüez, localización del apartamento de la señora Rivera Alequín y de la madre del señor Vélez Vélez,[24] para verificar que el apartamento de la señora Rivera Alequín tuviese una puerta trasera, pero no se inspeccionó el apartamento como tal.[25] Esgrimió que no se gestionó una orden de registro o allanamiento para incautar el arma mencionada por la perjudicada por lo que mediante su propio conocimiento no pudo declarar sobre la capacidad del arma para disparar.[26] No obstante, manifestó que el arma era capaz de disparar, según su investigación y lo expresado por la señora Rivera Alequín.[27]

---

[18] *Íd.* pág. 33, líneas 4-11.
[19] *Íd.* líneas 18-22.
[20] *Íd.* pág. 36, líneas 9-10.
[21] *Íd.* pág. 41, líneas 3-4, 7-11 y 13-21.
[22] *Íd.* pág. 67, línea 27; pág. 68, líneas 23-24.
[23] *Íd.* pág. 47, líneas 1-5; pág. 49, líneas 2-4; pág. 82, líneas 6-10.
[24] Íd. pág. 56, líneas 3-7; pág. 57, línea 4.
[25] *Íd.* pág. 59, líneas 25-27; pág. 56, líneas 17-19.
[26] *Íd.* pág. 61, líneas 1-4, 10; pág. 64, líneas 9-11.
[27] *Íd.* pág. 62, líneas 7-8, 12-13.

Además, explicó que no hizo constar en el expediente que la perjudicada tuviese alguna marca corporal, que le hayan tomado fotos, que hayan analizado su ropa, que la hayan llevado al hospital o que le hayan administrado un *rape kit* porque no hubo necesidad de ello según lo relatado en la primera entrevista.[28] A preguntas de la defensa sobre si la señora Rivera Alequín tenía alguna o ninguna marca física, la agente indicó que "había[n] daños psicológicos y emocionales."[29]

### Ricardo Luis Ayala Guzmán (Agente Ayala Guzmán)

El agente Ayala Guzmán testificó que es el agente de seguridad de la Fiscalía de Mayagüez, y el 11 de mayo de 2022 se encontraba haciendo gestiones de retén cuando la agente Rosado lo contactó. Lo anterior para canalizar una llamada telefónica con el teniente Wilfredo Soto Martínez para que este se personara en el lugar donde estaba la señora Rivera Alequín y le diera auxilio.[30]

### Teniente Wilfredo Soto Martínez (teniente Soto Martínez)

El teniente Soto Martínez era el supervisor en turno del cuartel de la Policía de Puerto Rico del Distrito de Mayagüez el día 11 de mayo de 2022.[31] Este declaró que recibió una llamada de Ayala para que atendiera una dama.[32] Relató que se dirigió a la Plaza del Mercado de Mayagüez junto con el agente Emilio Martínez.[33] Específicamente, narró que llegaron al segundo nivel del estacionamiento y se encontraron con una dama y dos niñas.[34] Reseñó que la dama se veía desesperada y angustiada, y que esta se acercó inmediatamente a la patrulla.[35] Continuó diciendo que las llevaron al cuartel de Mayagüez.[36] Posterior a esto, le asignó la

---

[28] *Íd.* pág. 71, líneas 28-31; pág. 72, línea 1; pág. 74, líneas 2-4; pág. 78, líneas 9-11.
[29] *Íd.* pág. 73-74 líneas 29-31 y 1-4.
[30] *Íd.* pág. 83, líneas 23-28; pág. 84, líneas 29-30.
[31] *Íd.* pág. 87, líneas 1-4, 15-16.
[32] *Íd.* pág. 88, líneas 1-3.
[33] *Íd.* líneas 14 y 16.
[34] *Íd.* líneas 19-21.
[35] *Íd.* líneas 25-26.
[36] *Íd.* líneas 28 y 30.

investigación al agente Martínez.[37] Por último, expresó que no le hizo preguntas a la dama sobre el asunto porque las entrevistas se realizaban en el cuartel y que no tomó notas porque manejaba la patrulla.[38]

**Agente Emilio Martínez Miranda (agente Martínez Miranda)**

El agente Martínez Miranda laboró para la Policía de Puerto Rico en el Distrito de Mayagüez y fue el encargado de la investigación preliminar del caso.[39] Relató que el 11 de mayo de 2022 se encontraba con el teniente Soto haciendo patrullaje preventivo en los predios del antedicho municipio cuando este último recibió una llamada.[40] Testificó que se dirigieron hacia el segundo nivel del estacionamiento de la Plaza del Mercado de Mayagüez y se encontraron con la señora Rivera Alequín.[41] Narró que la llevaron a la Comandancia de Mayagüez para comenzar la investigación preliminar con la posibilidad de que fuera un caso de Ley 54.[42]

Allí, procedió a entrevistarla y esta le manifestó que el evento por el cual acudió a la policía comenzó a las 12 de la medianoche de ese día.[43] Reseñó que la señora Rivera Alequín le relató que su pareja se presentó a su residencia para entrar a la fuerza porque quería tener relaciones sexuales forzosamente.[44] Expuso que la perjudicada le dijo que fue amenazada, ya que él la acusó de infidelidad y le enfatizó que, si no era de él, no era de nadie; además, que la iba a asesinar con un disparo si esta no estaba con él.[45] Entonces, la señora Rivera Alequín le expresó que temía por su vida.[46] El agente Martínez notó que la perjudicada aparentaba estar nerviosa, depresiva y temerosa.[47]

---

[37] *Íd.* pág. 89, líneas 5-6.
[38] *Íd.* pág. 90, líneas 24-26; pág. 93, líneas 7-9.
[39] *Íd.* pág. 93, líneas 25-28; pág. 95, líneas 26-27.
[40] *Íd.* pág. 94, líneas 9-10, 31; pág. 95, línea 2 y 4; pág. 98, línea 17.
[41] *Íd.* pág. 95, líneas 17 y 20.
[42] *Íd.* líneas 14-15, 22-27.
[43] *Íd.* pág. 96, línea 1-4.
[44] *Íd.* líneas 6-13.
[45] *Íd.* líneas 15-17.
[46] *Íd.* pág. 97, líneas 29-30.
[47] *Íd.* pág. 96, líneas 24 y 26.

Testificó que, luego de la entrevista inicial, le entregó a la señora Rivera Alequín una planilla informativa para que esta reflejara allí todo lo dicho.[48] Mientras ella llenaba el documento, el agente se comunicó con la división de violencia doméstica para que desarrollaran la investigación del caso.[49]

Por último, testificó que visitó el Residencial Yagüez en búsqueda del presunto agresor descrito por la perjudicada o de alguien que pudiese tener alguna relación a la dirección provista, pero que no fue al apartamento de la perjudicada.[50]

### **Yazmin Enid Rivera Alequín (señora Rivera Alequín)**

La última testigo de cargo fue la señora Rivera Alequín. Esta identificó al apelante, entonces acusado, antes de comenzar a esbozar su testimonio.[51] Indicó que el señor Vélez Vélez fue su pareja consensual, que era su vecino y que vivía frente a ella en Mayagüez. Relató que el 11 de mayo de 2022, a las 12 de la medianoche, recibió una llamada telefónica del señor Vélez Vélez.[52] Según la testigo, el apelante le dijo que, si no le abría la puerta, la rompería.[53] Ella estaba con sus hijas quienes se encontraban durmiendo. Le abrió la puerta, el entró a la casa y empezaron a discutir por unas fotos en su teléfono celular.[54] Expresó entonces que el señor Vélez Vélez era demasiado celoso con ella y le ordenó que se bañara para tener intimidad con ella.[55]

Continuó su testimonio diciendo que se percató de que el señor Vélez Vélez tenía un arma de fuego "negra y pequeña" debajo de su brazo.[56] Luego, dijo que el arma la tenía en su muslo derecho apuntando hacia la cama.[57] Él le preguntaba lo que hacía

---

[48] *Íd.* pág. 97, líneas 8-10, 12-14.
[49] *Íd.* líneas 19-22.
[50] *Íd.* pág. 97, líneas 24-25; pág. 108, líneas 6-8; pág. 110, líneas 15-18.
[51] *Íd.* pág. 113, líneas 21-24.
[52] *Íd.* líneas 25 y 30.
[53] *Íd.* líneas 27-28.
[54] *Íd.* pág. 114, líneas 7-9.
[55] *Íd.*
[56] *Íd.* líneas 23 y 26.
[57] *Íd.* pág. 115, líneas 20-23.

íntimamente con otras parejas. La discusión continuó y seguía insistiendo que en las fotos aparecían hombres quienes estuvieron con ella. Al ella negarlo, el seguía discutiendo. Al explicar donde se encontraba el arma, la testigo contestó lo tenía en el muslo derecho apuntando como hacia la cama. Lo antes fue consignado para efectos de récord por el fiscal que la dama estaba alzando su mano y explicaba la dirección hacia la cama.[58] Relató que, después que amaneció, sus hijas se fueran a la escuela. Él le dijo que ahora que las nenas no están te voy a quitar la vida.  Esto le causó mucho temor.[59] Seguidamente, la señora Rivera Alequín puntualizó que su pareja le expresó que quería tener intimidad con ella y que, luego de bañarse, accedió a tener relaciones sexuales por miedo que le fuera hacer daño.[60] La perjudicada expresó que "él tuvo relaciones anales conmigo y a la fuerza. Y yo le indico que me está lastimando. Y, y él me dijo pues que no iba tener relaciones conmigo porque estaba llorando."[61]  Narró  que el acto sexual fue a la fuerza y que la lastimó porque fue brusco y "no fue porque yo lo quise;" ella le dijo que la estaba lastimando y comenzó a llorar. Dijo que fue a la fuerza porque no quería hacerlo.[62] Reseñó que no recordaba haberle verbalizado a su pareja que no deseaba tener intimidad con él.[63] Sin embargo, narró que accedió a relaciones sexuales porque el apelante tenía un arma, que "estaba el arma en mi cuarto y pues yo tenía miedo y tenía que acceder porque ya él me había amenazado."[64]

Expresó que el apelante se retiró de su apartamento después de tener intimidad con ella.[65] Señaló que, a eso de las 1:30 de la tarde, se alistó para buscar a sus hijas a la escuela, tras decidir que

---

[58] *Íd.* pág. 115, líneas 24-28.
[59] *Íd.* pág. 116, líneas 3-6; pág. 133, líneas 23-24.
[60] *Íd.* pág. 116-117.
[61] *Íd.* pág. 116 líneas 11-15.
[62] *Íd.* líneas 11-13.
[63] *Íd.* líneas 16-18.
[64] *Íd.* líneas 21-22.
[65] *Íd.* pág. 118, línea 7.

iba a abandonar su casa.[66] Expuso que salió por la parte posterior de su casa porque el señor Vélez Vélez era su vecino y no quería que él la viera cuando se estaba yendo. Lo antes, porque ya le había dicho que "me quería quitar la vida, pues yo decidí ese día huir."[67] Luego de esto, buscó una de las hijas a la escuela Manuel Barreto y la otra en la Hostos en Mayagüez. Llamó a su madre y le dijo "tengo que irme pa (sic) un hogar" porque no se podía quedar en la casa. Se comunicó con Yazmín Ramírez de un hogar en Aguadilla. Se dirigió al terminal de carros públicos con sus hijas y estuvo allí casi dos horas hasta que llegó la policía.[68] Los dos agentes que la socorrieron, la llevaron a la comandancia y luego a un hogar.[69] Allí, le informaron que debía hacer una querella o solicitar una orden de protección, a lo cual se negó por miedo a las repercusiones que esto pudiese implicar.[70] Especificó que: "dije brevemente lo que había pasado, ese día. No di muchos detalles porque andaba con mis hijas y había muchas- el día fue intenso y, pues no- el papel era corto y no podía detallar todo lo que pasó ese día."[71]

Durante su testimonio, se admitió en evidencia la planilla informativa que llenó el 11 de mayo de 2022.[72] Expresó que en el referido documento no escribió nada sobre el arma que portaba el señor Vélez Vélez o el hecho de que este fue brusco con ella en los eventos del 11 de mayo de 2022.[73]

A preguntas del fiscal la señora Rivera Alequín relató que en el mes de diciembre de 2021 el apelante le apuntó con un arma de fuego "negra y pequeña" y la agarró por su ropa interior para quitársela porque quería tener relaciones sexuales.[74] A solicitud del

---

[66] *Íd.* pág. 118, línea 31; pág. 119, líneas 1-3, 22-23; pág. 120, línea 1.
[67] *Íd.* pág. 119 líneas 16-23.
[68] *Íd.* pág. 120, línea 24; pág. 121, líneas 1-3.
[69] *Íd.* pág. 121, líneas 18-26.
[70] *Íd.* pág. 122, líneas 8-10.
[71] *Íd.* pág. 125, líneas 8-10.
[72] *Íd.* pág. 125, líneas 26-28.
[73] *Íd.* pág. 140, líneas 10-14; pág. 141, líneas 7-10.
[74] *Íd.* pág. 128, líneas 26-29; pág. 129, líneas 1-9.

Fiscal, la testigo se puso de pie y describió ante el jurado cómo fue que él apuntó. Contestó "como así como pa (sic) donde mi".[75] El señor Vélez Vélez la soltó cuando ella gritó.[76] Entonces, relató que el apelante se disculpó y le prometió que no lo volvería a hacer.[77] La señora Rivera Alequín testificó que no acudió a las autoridades por este evento por miedo a que el apelante le hiciera daño.[78] Continuó en una relación sentimental con este.[79] Testificó que los eventos ocurridos en diciembre de 2021 solo se los dijo al fiscal, no a los agentes que la llevaron a la comandancia o a la agente Rosado.[80]

Asimismo, declaró que el 13 de mayo de 2022 fue entrevistada por la agente Rosado, a quien le contó lo ocurrido.[81] Al continuar con su testimonio, mencionó que el apelante tenía un arma de fuego "negra y pequeña" debajo del hombro y que estuvo en una bolsa mientras tenían relaciones sexuales.[82] Aunque el arma estuviese en una bolsa, la señora Rivera Alequín dijo que se sentía amenazada porque, en cualquier momento, el señor Vélez Vélez le podía hacer daño.[83]

También, testificó que su teléfono fue revisado por servicios técnicos y que no recordaba si surgió de ello algo importante.[84] Además, expresó que no les manifestó a los agentes que la entrevistaron que estaba lastimada.[85] Igualmente, aseguró que estos no le preguntaron si ella tenía la necesidad de ir a un hospital y tampoco le orientaron sobre la prueba del *rape kit*.[86] En adición, admitió que no les detalló que hubo un encuentro sexual o una amenaza de muerte a los agentes de la policía.[87]

---

[75] *Íd.* pág. 130, líneas 11-18.
[76] *Íd.* pág. 128, línea 31; pág. 129, líneas 12, 18-20.
[77] *Íd.* pág. 129, línea 17.
[78] *Íd.* pág. 130, líneas 27-31; pág. 131, líneas 1-4.
[79] *Íd.* pág. 138, líneas 19-21.
[80] *Íd.* líneas 3, 7-18; pág. 133, 5-8.
[81] *Íd.* pág. 131, líneas 25-30; pág. 132, líneas 1-2.
[82] *Íd.* pág. 133, líneas 14-17.
[83] *Íd.* líneas 20-25.
[84] *Íd.* pág. 136, líneas 3-13.
[85] *Íd.* pág. 142, líneas 2-9.
[86] *Íd.* líneas 10-14.
[87] *Íd.* pág. 142, líneas 23-31; pág. 143, línea 1; pág. 144, líneas 22-25.

Sometido el caso, la defensa presentó una solicitud de absolución perentoria al amparo de la Regla 135 de Procedimiento Criminal, *infra*. En síntesis, alegó que no se probaron elementos de los delitos imputados y solicitó la intervención del tribunal para que este hiciera un análisis de la suficiencia de la prueba presentada.

En particular, arguyó que no se probó el elemento de falta de consentimiento necesario para que se consumara una agresión sexual debido a que el señor Vélez Vélez no tenía el arma consigo durante el acto, lo cual constituiría el elemento de intimidación. Además, argumentó que la perjudicada no le expresó al apelante que no deseaba tener relaciones sexuales con él en ningún momento, lo cual hacía insuficiente para probar el elemento de falta de consentimiento. Asimismo, sostuvo que no hubo la tentativa de agresión sexual imputada porque el señor Vélez Vélez desistió voluntariamente luego de las manifestaciones de la señora Rivera Alequín.

Igualmente, arguyó que, como no se presentó prueba de que el arma mencionada era un arma de fuego capaz de disparar un proyectil, no resultaba suficiente para sostener convicciones de portación de armas de fuego y apuntar un arma de fuego. Sobre esto, enfatizó que la prueba documental presentada por el Ministerio Público sobre la portación era insuficiente porque podía haber muchas personas en el país con el mismo nombre del apelante. Por último, solicitó la absolución perentoria de la acusación de apuntar un arma porque no se pudo probar que era un arma de fuego capaz de disparar.

El Ministerio Público se opuso a la solicitud de absolución perentoria porque versaba sobre aspectos de credibilidad o confiabilidad de la prueba que debían ser evaluados por el jurado.

Específicamente, arguyó que una agresión sexual implica una relación sexual no consentida. Toda vez que la perjudicada estaba

en un estado mental de intimidación y amenaza por la presencia del arma de fuego en su cuarto y el apelante la había amenazado con quitarle la vida antes del acto, estaba imposibilitada de prestar su consentimiento. Igualmente, sostuvo que el hecho de no haber expresado verbalmente su consentimiento era un asunto que debía ser evaluado por el jurado.

Luego de esto, argumentó que se configuró el delito de tentativa de agresión sexual conyugal porque el desistimiento requiere la voluntad del autor de no cometer el delito o evitar sus resultados si se ha comenzado y, según se desprende de la prueba, el señor Vélez Vélez se detuvo luego de que la señora Rivera Alequín gritara; siendo así, el jurado debía evaluar la línea entre el desistimiento o tentativa por ello ser un asunto de apreciación de prueba.

Finalmente, sobre la portación del arma sin licencia, el Ministerio Público expresó que la jurisprudencia no requiere que se ocupe un arma para probar su existencia y, si no se ocupa un arma, no es posible determinar si tiene la capacidad de disparar o no; lo importante, según adujo, es que se pruebe que el acusado portó y apuntó un arma de fuego en determinado momento. En cuanto al argumento sobre la búsqueda de la licencia de portación, el Ministerio Público se limitó a señalar que hubo una testigo que expresó haber hecho personalmente la búsqueda en el sistema de Registro de Armas por el seguro social y el nombre del apelante, y que la credibilidad de este testimonio la debía evaluar el jurado.

El foro de instancia se reservó su determinación hasta que el jurado rindiera sus veredictos. Tras escuchar los informes finales y las instrucciones, el jurado emitió un veredicto unánime de culpabilidad contra el señor Vélez Vélez en todos los cargos. El TPI procedió a declarar No Ha Lugar a la solicitud de absolución perentoria.

El 5 de febrero de 2024, el TPI dictó una *Sentencia* mediante la cual condenó al apelante Vélez Vélez a cumplir cincuenta (50) años de prisión, desglosados de la siguiente manera: tres (3) años de cárcel por infracción al Artículo 3.3; veinticinco (25) años de cárcel por infringir el Artículo 3.5; diez (10) años de cárcel por la tentativa del Artículo 3.5, todos de la Ley 54, *infra*; diez (10) años en cada cargo por violar el Artículo 6.05, y cinco (5) años de cárcel por la infracción al Artículo 6.14 (b), ambos de la Ley de Armas de Puerto Rico, *infra*.

Inconforme, el apelante acude ante esta Curia y le imputa al foro primario la comisión de los siguientes errores:

A. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR NO HA LUGAR UNA MOCIÓN AL AMPARO DE LA REGLA 135 DE PROCEDIMIENTO CRIMINAL SOLICITANDO LA ABSOLUCIÓN PERENTORIA DEL ACUSADO, TODA VEZ QUE EL MINISTERIO PÚBLICO NO PRESENT[Ó] PRUEBA DE TODOS LOS ELEMENTOS DEL DELITO.

B. ERRÓ EL JURADO AL ENCONTRAR CULPABLE AL SEÑOR DANIEL VÉLEZ VÉLEZ [SIC] EN VIRTUD DE UNA PRUEBA QUE NO DERROTÓ SU PRESUNCIÓN DE INOCENCIA Y MUCHO MENOS ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE.

C. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO IMPARTIR LA INSTRUCCIÓN AL JURADO SOBRE ARMA NEUMÁTICA, CUANDO EL MINISTERIO PÚBLICO NO PRESENT[Ó] PRUEBA MÁS ALLÁ DE DUDA RAZONABLE SOBRE LA PORTACIÓN DE UN ARMA DE FUEGO EN LOS DOS CARGOS PRESENTADOS.

D. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO DESESTIMAR LOS PLIEGOS ACUSATORIOS RELACIONADOS A LA PORTACIÓN DE ARMA DE FUEGO [SIC] POR VIOLACIÓN AL DEBIDO PROCESO DE LEY, YA QUE EL ESTADO NO ENTREGÓ DURANTE EL DESCUBRIMIENTO DE PRUEBA LA DOCUMENTACIÓN A LA QUE SE HIZO REFERENCIA EN EL JUICIO Y LA CUAL PUEDE CATALOGARSE COMO PRUEBA EXCULPATORIA. ADEMÁS – LA PRESENTACIÓN DE DICHA PRUEBA DE MANERA SORPRESIVA [SIC] LE CAUSÓ UN PERJUICIO INDEBIDO AL ACUSADO.

E. INCURRIÓ EN ERROR EL JURADO AL HALLAR CULPABLE AL ACUSADO DE LOS CARGOS DE AGRESIÓN SEXUAL, SIN QUE EL MINISTERIO PÚBLICO EVIDENCIARA MÁS ALLÁ DE DUDA RAZONABLE TODOS LOS ELEMENTOS DEL DELITO IMPUTADO.

F. INCURRIÓ EN ERROR EL JURADO AL HALLAR CULPABLE AL ACUSADO DE LOS CARGOS DE TENTATIVA DE AGRESIÓN SEXUAL, SIN QUE EL MINISTERIO PÚBLICO EVIDENCIARA MÁS ALLÁ DE DUDA RAZONABLE **TODOS LOS ELEMENTOS** DEL DELITO IMPUTADO, AÚN CUANDO DE LA PROPIA PRUEBA DEL ESTADO SURGE QUE HUBO UN DESISTIMIENTO POR PARTE DEL APELANTE.

G. INCURRIÓ EN ERROR EL JURADO AL HALLAR CULPABLE AL ACUSADO DE LOS CARGOS DE ARMAS, SIN QUE EL MINISTERIO PÚBLICO EVIDENCIARA MÁS ALLÁ DE DUDA RAZONABLE **TODOS LOS ELEMENTOS** DE LOS DELITOS IMPUTADOS. ESTO ANTERIOR, DEBIDO A QUE EL MINISTERIO PÚBLICO NO PRESENTÓ PRUEBA QUE ESTABLECIERA QUE DICHA ARMA ERA CAPAZ DE DISPARAR UN PROYECTIL.

El 16 de mayo de 2025, el Procurador General presentó su alegato en oposición. En esencia, arguyó que el TPI no erró al denegar la solicitud de absolución perentoria toda vez que el Ministerio Público presentó un caso *prima facie* en contra del apelante al establecer todos los elementos de los delitos imputados y su conexión con este. Asimismo, que demostró más allá de duda razonable la culpabilidad del señor Vélez Vélez con prueba que el jurado valoró como suficiente y la adjudicó en su contra. En adición, que el error sobre la instrucción al jurado se basa en un planteamiento frívolo y sin mayores elaboraciones. Por último, catalogó el planteamiento sobre la ocultación de prueba exculpatoria como un intento de minar la apreciación de prueba hecha por el jurado.

Con el beneficio de la comparecencia de ambas partes, la transcripción de la prueba oral y los autos originales procedemos a resolver el recurso ante nuestra consideración. Veamos.

**II.**

**A. Apreciación de la prueba y estándar de revisión judicial**

La presunción de inocencia es de rango constitucional y se encuentra en el Art. II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo I; *Pueblo v. Negrón Ramírez,* 213 DPR 895, 907 (2024). Toda persona acusada goza de la presunción de inocencia en los procesos criminales. *Íd.* Dicha presunción también forma parte de las Reglas 110 y 304 de Evidencia, 32 LPRA Ap. VI, y requiere que el Estado la derrote con prueba que establezca la culpabilidad del acusado más allá de duda razonable. *Pueblo v. Negrón Ramírez, supra*; *Pueblo v. Colón González,* 209 DPR 967, 977 (2022). Probar la culpabilidad más allá de duda razonable requiere la presentación de prueba sobre los elementos del delito y la conexión de la persona acusada con el delito. *Íd.* Ante la existencia de duda razonable acerca de la culpabilidad del acusado, el juzgador de los hechos debe absolverlo. Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110; *Pueblo v. Santiago et al.*, 176 DPR 133, 142 (2009).

Lo anterior no significa que el Estado tenga que destruir toda duda posible, especulativa o imaginaria a los fines de probar la culpabilidad de la persona acusada con certeza matemática. *Pueblo v. Negrón Ramírez, supra*; *Pueblo v. Casillas, Torres,* 190 DPR 398, 414 (2014). El Estado debe presentar prueba suficiente que establezca en el juzgador de los hechos "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no provenido". *Íd.* págs. 414-415.

Sabido es que la Constitución del Estado Libre Asociado de Puerto Rico dispone el derecho a juicio por jurado de toda persona acusada de delito grave. Art. II, Sec. 11, Const. ELA, *supra*; *Pueblo v. Negrón Ayala,* 171 DPR 406, 413 (2007).

Ante tal esquema, le corresponde al jurado, como encomienda principal, ser el juzgador de los hechos. *Pueblo v. Rosario*, 160 DPR 592, 603 (2003). Es el jurado quien tiene la última palabra en cuanto a la culpabilidad o inocencia del imputado y será quien determine el delito específico, o el grado, por el cual este debe responder. *Íd.* Además, el jurado debe evaluar la evidencia presentada y admitida por el tribunal durante el juicio y llegar a las conclusiones de hechos correspondientes y aplicar el derecho, siguiendo las instrucciones impartidas por el juez que presida el proceso. *Íd.* Es también el jurado el llamado a aquilatar la prueba desfilada y decidir si le merece o no credibilidad. *Pueblo v. Lorio Ormsby*, 137 DPR 722, 727 (1994).

Asimismo, la Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110, prescribe, en lo pertinente, lo siguiente:

> La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:
>
> [...]
>
> (c) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza.
>
> (d) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.
>
> [...]
>
> (h) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquellas que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

Conforme a lo anterior, el testimonio de un solo testigo, que le merezca entera credibilidad al juzgador de hechos, es prueba suficiente para demostrar la culpabilidad de un acusado más allá de duda razonable y derrotar, así, la presunción de inocencia. *Pueblo*

*v. de Jesús Mercado*, 188 DPR 467, 476 (2013); véase, además, *Pueblo v. Chévere Heredia*, 139 DPR 1, 15 (1995). De igual forma, la prueba circunstancial, esta es, aquella que se basa en una inferencia razonable, es tan suficiente como la prueba directa para probar cualquier hecho adjudicativo, incluso, en casos penales. *Pueblo v. Pagán Ortiz*, 130 DPR 470 (1992).

En *Pueblo v. Cabán Torres, supra*, pág. 656, se resolvió que, no existe el "testimonio perfecto". Este, de ordinario, en lugar de ser indicativo de veracidad, es altamente sospechoso porque, por lo general, es producto de la fabricación. *Íd.* Por tanto, evaluar un argumento sobre inconsistencias y contradicciones en la prueba testifical, plantea "una de las situaciones más delicadas, difíciles y angustiosas con las que se confrontan los componentes de un tribunal apelativo en su diaria labor". *Íd.* pág. 653. En ese sentido, los conflictos de un testimonio son dirimidos por el jurado o el juez del Tribunal de Primera Instancia, y solo procede alterar el valor, la credibilidad y la determinación ante la demostración de circunstancias extraordinarias. *Pueblo v. Torres Rivera*, 137 DPR 630, 640 (1994).

Ante un planteamiento sobre insuficiencia de prueba, la función revisora apelativa "consiste en evaluar si la evidencia admitida cumplió con el estándar probatorio de establecer la culpabilidad del acusado más allá de duda razonable". *Pueblo v. Negrón Ramírez, supra*. Ahora bien, cuando el reclamo es atinente a la apreciación de la prueba, lo que se impugna es la valorización, la credibilidad o el aquilatamiento que el juzgador de los hechos adjudicó a la prueba desfilada durante el juicio. *Íd.*

Es norma reiterada que los tribunales apelativos no intervienen, de ordinario, con la apreciación y la adjudicación de credibilidad realizada por el Tribunal de Primera Instancia en relación con la prueba testifical. *Pueblo v. Hernández Doble*, 210

DPR 850, 864-865 (2022). En ausencia de una valoración apasionada, prejuiciada, parcializada o manifiestamente errónea, los foros apelativos deben abstenerse de intervenir con la apreciación de la prueba y la credibilidad adjudicada por el juzgador de los hechos. *Pueblo v. Arlequín Vélez*, 204 DPR 117, 147 (2020). La apreciación de la prueba desfilada en un juicio criminal es un asunto combinado de hecho y derecho, y, por tanto, se puede revisar en apelación la controversia en torno a si el Estado probó la culpabilidad del acusado más allá de duda razonable. *Pueblo v. Negrón Ramírez, supra*. En consecuencia, puede existir una excepción a la doctrina de abstención si, al analizar integralmente la prueba testifical, se produce en el ánimo del foro apelativo "una insatisfacción o intranquilidad de conciencia tal que se estremezca su sentido básico de justicia". *Pueblo v. Arlequín Vélez, supra*, pág. 148.

Como se sabe, la parte apelante es la llamada a señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán Torres,* 117 DPR 645, 648 (1986). De conformidad, el Tribunal Supremo de Puerto Rico ha resuelto que, los tribunales apelativos intervienen con la apreciación de la prueba cuando: (1) el apelante demuestra la existencia de pasión, prejuicio, parcialidad o error manifiesto; o (2) si la apreciación de la prueba no concuerda con la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Negrón Ramírez, supra*, págs. 912-913.

**B. Absolución perentoria**

Como vimos, es uno de los pilares constitucionales más importantes en nuestra jurisdicción que, para sostener una convicción criminal, se pruebe la comisión del crimen utilizando el estándar evidenciario de más allá de duda razonable. Es imprescindible que la prueba, circunstancial o directa, sea suficiente en derecho para que sea certera la determinación de

culpabilidad vertida contra una persona que haya delinquido. *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 552 (1974). Así, en un juicio, es irrealizable que se condene a un acusado cuando la prueba presentada es insuficiente. *Pueblo v. Colón, Castillo*, 140 DPR 564, 576 (1996). Para evitar este suceso, opera la figura de la absolución perentoria. Esta versa sobre la facultad que tiene un tribunal para examinar la suficiencia de la prueba de cargo y decretar la culpabilidad de un acusado. *Íd.* pág. 580.

En lo particular, la Regla 135 de Procedimiento Criminal, *supra*, R. 135, dispone lo siguiente:

> El tribunal a instancia propia o a instancia de un acusado decretará su absolución perentoria en uno o varios cargos de la acusación o denuncia luego de practicada la prueba de una o de ambas partes si la misma fuere insuficiente para sostener una convicción por ese cargo o cargos.

> De presentarse una moción de absolución perentoria, luego de practicada toda la prueba, el tribunal podrá reservarse su resolución, someter el caso al jurado y resolver la moción, bien antes del veredicto o después del veredicto o de disolverse el jurado sin rendir veredicto. Si el tribunal declarare sin lugar la moción antes de rendirse un veredicto de culpabilidad o de disolverse el jurado sin veredicto, la moción podrá reproducirse dentro del término jurisdiccional de los cinco (5) días de rendido el veredicto o disuelto el jurado, siempre que no se hubiere dictado sentencia.

Esta regla viabiliza que el tribunal impida la continuación del caso o que revoque el veredicto del jurado cuando la prueba es insuficiente para sostener la convicción. *Pueblo v. Rivera Ortiz*, 150 DPR 457, 462 (2000). Es decir, la absolución perentoria involucra un análisis de suficiencia de prueba. *Íd.* Se considera que la prueba es suficiente cuando esta "permite en derecho hallar a un ciudadano culpable más allá de duda razonable, por lo cual se requiere que el Pueblo establezca todos los elementos del delito y la conexión del acusado con éstos". *Íd.*, citando a *Pueblo v. Colón, Castillo, supra,* pág. 581. También, la prueba suficiente debe ser susceptible de ser creída. *Pueblo v. Colón, Castillo, supra,* pág. 584. Esto implica, como se mencionó, que el Ministerio público debe exponer todos los elementos del delito y establecer la conexión del acusado con lo

ocurrido para poder hallarlo culpable. *Íd.* pág. 581; *Pueblo v. Rivera Ortiz, supra*, págs. 462-463.

La resolución de una moción de absolución perentoria requiere un análisis de estricto derecho donde se verifiquen que los requisitos legales se cumplan para que el veredicto sea posible. *Pueblo v. Rivera Ortiz, supra*, págs. 462-463. Esto es porque el análisis de suficiencia de prueba examina el contenido y existencia de la evidencia, no su valor o peso probatorio, para que entonces el jurado pase a deliberar. *Pueblo v. Colón, Castillo, supra*, págs. 578-579. Así pues, no es un asunto de credibilidad de la prueba, ya que la evaluación de esto es una facultad exclusiva del jurado y no requiere conocimiento especializado en derecho. *Íd.* pág. 578. Por esto, el tribunal "ha de limitarse a adjudicar si la prueba es suficiente en derecho para proceder a someterla al Jurado" porque los requisitos legales mínimos deben estar presentes antes de que ellos consideren la evidencia. *Íd.* págs. 580-581. Si la prueba de cargo es insuficiente, un jurado no puede rendir un veredicto de culpabilidad conforme a derecho y procedería la absolución del acusado por imperativo constitucional. *Íd.* pág. 581.

Al ser esta una determinación de estricto derecho es revisable por el Ministerio Público porque, de prevalecer, solo procedería reinstalar el veredicto de culpabilidad para que se dicte sentencia sin la necesidad de procedimiento ulterior. *Pueblo v. Rivera Ortiz, supra*, págs. 464-465, citando a E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, Vol. III, págs. 413-414. Esto implica que el acusado no estaría expuesto a un nuevo juicio por el mismo delito. *Íd.* pág. 465. Además, cuando un juez atiende una moción de absolución perentoria, puede absolver al acusado de un delito si no se han probado todos sus elementos, pero si hay prueba suficiente, puede hallarlo culpable por un delito menor incluido sin que esto violente

la cláusula de la doble exposición. *Íd.* pág. 464. Lo medular es que "no exista posibilidad de que el imputado tenga que someterse a un nuevo juicio por la *misma ofensa*". *Íd.* (Énfasis suplido). Esto también, como es una cuestión de estricto derecho, sería revisable por el Estado.

**C. Prueba potencialmente exculpatoria**

Nuestro sistema de justicia criminal reconoce el derecho de todo acusado a informarse debidamente en la preparación adecuada de su defensa, como parte del debido proceso de ley. Dicho esto, se ha resuelto que el derecho al descubrimiento de prueba es consustancial con el derecho de todo acusado a defenderse en un proceso criminal en su contra. *Pueblo v. Arzuaga*, 160 DPR 520, 530 (2003); *Pueblo v. Santa-Cruz*, 149 DPR 223, 231 (1999).

Sin embargo, el derecho al descubrimiento de prueba no es absoluto. Los límites a este derecho están esbozados en la Regla 95 de Procedimiento Criminal, *supra*, R. 95, con el fin de desalentar las expediciones de pesca. *Pueblo v. Arzuaga, supra*, pág. 530; *Pueblo v. Echevarría Rodríguez I*, 128 DPR 299, 324 (1991).

El inciso (b) de la antedicha regla le impone el deber al Ministerio Público de revelar toda la prueba exculpatoria que posea. La prueba exculpatoria es aquella que le resulte favorable al acusado y que sea relevante a la culpabilidad o castigo. *Pueblo v. Echevarría Rodríguez I, supra*, pág. 333. Existe un interés apremiante en presentarle al juzgador de los hechos toda prueba significativa dirigida a establecer la inocencia de un acusado. *Pueblo v. Rodríguez Sánchez*, 109 DPR 243, 247 (1979). Lo anterior le provee al acusado los medios necesarios para carearse con los testigos de cargo e impugnarlos de manera eficaz. *Íd.*

Si el Ministerio Público incumple con este deber y oculta, suprime u omite prueba exculpatoria, incurre en una violación al debido proceso de ley. *Pueblo v. Arzuaga, supra*, pág. 536. Tal

incumplimiento podría acarrear la revocación de la convicción y la celebración de un nuevo juicio, pero ello dependerá de la relevancia y materialidad de la evidencia suprimida. *Pueblo v. Vélez Bonilla*, 189 DPR 705, 723-724 (2013). Para determinar esto último, es necesario examinar si la supresión de la evidencia socava la confianza en el resultado del juicio. *Íd.* El análisis se realiza a base de un estándar de probabilidad razonable. *Íd.*, citando a *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) y *United States v. Bagley*, 473 U.S. 667, 678 (1985); véase, además, *Pueblo v. Velázquez Colón*, 174 DPR 304, 333 (2008); *Pueblo v. Rodríguez*, 193 DPR 987, 1009 (2015).[88]

En *Pueblo v. Vélez Bonilla*, 189 DPR 705 (2013), el Tribunal Supremo de Puerto Rico expresó que en aquellas situaciones en las cuales no se puede determinar a ciencia cierta si, la evidencia recolectada por el Estado en la etapa investigativa y que ya no existe, hubiera obrado a favor o en contra del acusado tal tipo de evidencia se denomina evidencia "potencialmente exculpatoria". *Íd.*

En *Brady v. Maryland*, 373 U.S. 83 (1963), el Tribunal Supremo de Estados Unidos resolvió que violentó el debido proceso de ley la no disponibilidad de cierta evidencia, en particular ciertos vídeos en poder de la Policía, ya sea por causa intencional o negligencia, si estos vídeos eran útiles para que la defensa pudiera presentar su caso de forma adecuada.

Considerando lo anterior, en *Pueblo v. Vélez Bonilla, supra,* se resolvió que en circunstancias en las que la evidencia no preservada por el Estado sea potencialmente exculpatoria, es más justo y pragmático añadir la negligencia como requisito, en la alternativa a la mala fe del Estado. En este contexto, definió "negligencia" como

---

[88] Véase *Pueblo v. Velázquez Colón*, 174 DPR 304, 333 (2008) y *Pueblo v. Rodríguez*, 193 DPR 987, 1009 (2015).

aquella circunstancia en donde el Estado haya fallado en ejercer el cuidado que una persona común ejercería. *Íd.*

Allí mismo se resolvió que en la eventualidad de un reclamo por violación al debido proceso de ley por evidencia no disponible por no haber sido debidamente cuidada o preservada, el Tribunal de Primera Instancia deberá considerar los siguientes tres factores, en orden de prelación: (1) determinar que la evidencia no está disponible por una acción u omisión del Estado; (2) determinar que la evidencia constituía evidencia pertinente conforme se define en la Regla 401 de las Reglas de Evidencia de Puerto Rico, *supra*, R. 401; y (3) determinar que, según la teoría de la defensa, de estar disponible esta evidencia obraría a favor del acusado. *Íd.*

Sin embargo, para cumplir con este tercer parámetro, el acusado tiene que poner al tribunal en posición de determinar, partiendo del supuesto de que hubiera sido exculpatoria, cómo esta prueba pudo haberle ayudado. *Íd.* Además, en cuanto a este tercer factor propuesto y conforme al estándar de probabilidad razonable, evidencia "potencialmente exculpatoria" no es aquella que hubiera producido la absolución del acusado, sino aquella suficiente para minar o socavar la confianza en el resultado. *Íd.* Esta es una evidencia que de haberse presentado *a posteriori* hubiera llevado a pensar a una persona prudente y razonable que el fallo o veredicto, aunque podría sostenerse, "ya no es tan confiable". *Íd.*

Si el acusado plantea una violación al debido proceso de ley por la pérdida o destrucción de prueba potencialmente exculpatoria, el Ministerio Público deberá exponer las circunstancias que lo llevaron a perder o destruir la evidencia en controversia. El acusado, a su vez, podrá presentar la evidencia que entienda pertinente y necesaria al asunto. El tribunal entonces determinará si las actuaciones del Estado son constitutivas de mala fe o negligencia. *Íd.*

Cuando el tribunal encuentre que las actuaciones del Estado son constitutivas de mala fe, procederá a desestimar. Si el tribunal entiende que el Estado fue negligente, será de aplicación la presunción a favor del acusado, según establece la 301(c) de las Reglas de Evidencia, *supra*, R. 301 (c). Por su parte, cuando el Ministerio Público pruebe que sus acciones no se deben a la negligencia o mala fe, entonces el Tribunal de Primera Instancia determinará que no ha habido violación al debido proceso de ley. *Íd.*

En lo que concierne a la prueba sorpresiva, esta no es admisible en los juicios como regla general. Es sorpresiva aquella prueba que se admite en el juicio, pero de la cual alguna parte no tenía conocimiento porque no estuvo sujeto a descubrimiento de prueba. Sin embargo, cuando un acusado tiene conocimiento previo de la información sorpresiva, es admisible como evidencia si la admisión no socava otro principio evidenciario o si no cae dentro de las excepciones permitidas de estos. *Pueblo v. Pintos Lugo*, 131 DPR 1015, 1018-1019 (1992).

## D. Delitos de la Ley Núm. 54

### a. *Maltrato mediante amenaza*

El propósito de la aprobación de la Ley Núm. 54 de 15 de agosto de 1989, mejor conocida como la Ley para la Prevención e Intervención con la Violencia Doméstica, 8 LPRA secs. 601 et al., es contrarrestar, como cuestión de política pública, la violencia doméstica. 8 LPRA sec. 601.

La referida ley, en su Artículo 3.3, tipifica como delito el maltrato mediante el empleo de amenaza, e indica como sigue:

> Toda persona que amenazare con causarle daño a su cónyuge, ex cónyuge, a la persona con quien habita o con quien haya cohabitado o con quien sostiene o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación, a los bienes apreciados por ésta, excepto aquéllos que pertenecen privativamente al ofensor, o a la persona de otro, incurrirá en delito grave de cuarto grado en su mitad superior.

> El tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida.
>
> 8 LPRA sec. 633.

A través de este artículo, la Ley Núm. 54 "[c]astiga el maltrato psíquico que se realiza a través de amenazas[.]" *Pueblo v. Ayala García*, 186 DPR 196, 213 (2012). Nótese que los elementos del delito son: (1) una manifestación de causar un daño determinado; (2) contra una persona con quien se sostuvo o sostiene una relación de pareja, sus bienes apreciados o a la persona de otro. No requiere un patrón de conducta maltratante ni un efecto sobre el ánimo de la víctima. *Íd.*

Siendo así, este delito se configura una vez el sujeto activo profiere la amenaza. Toda vez que no está definida en la ley, se entiende que la palabra "amenaza" se utiliza en el sentido coloquial de dar a entender a alguien que se le causará algún mal. *Íd.* n. 49.

### b. *Agresión sexual conyugal*

Por otro lado, uno de los delitos noveles que tipifica la Ley 54, *supra*, es la agresión sexual conyugal. En lo pertinente, el Artículo 3.5, 8 LPRA sec. 635, dispone que:

> Se impondrá pena de reclusión, según se dispone más adelante, a toda persona que incurra en una relación sexual no consentida con su cónyuge o ex cónyuge, o con la persona con quien cohabite o haya cohabitado, o con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, independientemente del sexo, estado civil, orientación sexual, identidad de género o estatus migratorio de cualquiera de las personas involucradas en la relación, en cualesquiera de las circunstancias siguientes:
>
> > (a) Si se ha compelido a incurrir en relación sexual mediante el empleo de fuerza, violencia, intimidación o amenaza de grave e inmediato daño corporal[.]
> >
> > [...]
>
> El delito de agresión sexual conyugal no prescribe cuando la víctima sea menor de 18 años, y el imputado o imputada mayor de 18 años al momento de la comisión del delito. La pena a imponerse por este delito, en todas sus modalidades, será la correspondiente a delito grave de segundo grado severo.
>
> [...]

Este delito es una vertiente de la agresión sexual, según tipificada en el Artículo 130 del Código Penal de Puerto Rico, Ley Núm. 146-2012, 33 LPRA sec. 5191. En lo específico, el sujeto activo y sujeto pasivo en este delito tienen un historial de relación consensual, sea en el presente o en el pasado, a diferencia de la agresión sexual base que no contempla algún tipo de relación afectiva entre el sujeto activo y el pasivo. Aunque consideren sujetos diferentes, la agresión sexual conyugal es una forma específica de agresión sexual. Así, debemos perfilar en qué consiste el delito base antes de volver a considerar la conducta tipificada en la Ley 54, *supra.*

El delito de agresión sexual se configura cuando alguien "a propósito, con conocimiento o temerariamente lleve a cabo, o que provoque que otra persona lleve a cabo, un acto orogenital o una penetración sexual vaginal o anal ya sea ésta genital, digital, o instrumental". 33 LPRA sec. 5191. Sobre las circunstancias, el Código Penal especifica que el delito de agresión sexual "consiste esencialmente en la agresión inferida a la integridad física, síquica o emocional y a la dignidad de la persona. Cualquier acto orogenital o penetración sexual, vaginal o anal, ya sea ésta genital, digital o instrumental, por leve que sea, bastará para consumar el delito". *Íd.* sec. 5193.[89] Es importante destacar que, para probar la agresión sexual, no es necesario que se le encuentren laceraciones, moretones o traumas en los genitales a la víctima. *Pueblo v. Mattei Torres*, 121 DPR 600, 613-614 (1988).

**H. Tentativa y desistimiento**

Una conducta criminal puede ser castigada, aunque no se perfeccione el delito pretendido. *Pueblo v. Reyes Carrillo*, 207 DPR 1056, 1067 (2021). Cuando una persona intenta cometer

---

[89] Véase D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, Instituto para el Desarrollo del Derecho, 2019, pág. 221 (Supl. 2023) donde se enfatiza que se utiliza un lenguaje neutro en cuanto al género.

intencionalmente una conducta prohibida y, por razones ajenas a su voluntad, no se concreta, estamos ante una tentativa de delito. *Pueblo v. Rosado*, 143 DPR 907, 914 (1997). Específicamente, nuestro Código Penal expresa que "[e]xiste tentativa cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad". 33 LPRA sec. 5048.

> En lo pertinente, la tentativa requiere:
>
> 1) la realización de una acción u omisión; 2) a propósito o con conocimiento y de forma inequívoca –sin duda alguna– a cometer un delito; 3) que constituya la fase inmediatamente anterior o el primero de los actos exigidos por el tipo; y 4) un resultado que no se ha verificado o consumado por causas ajenas a la voluntad del actor. Entiéndase, además, que para que al acto sea inequívoco e inmediato la conducta debe adentrarse en el tipo delictivo. D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, Instituto para el Desarrollo del Derecho, 2019, págs. 75-76 (Supl. 2023).

Respecto al desistimiento, el Tribunal Supremo ha expresado que la mera manifestación de abandonar la comisión de un delito ya comenzado no equivale a un desistimiento. *Pueblo v. Lamboy*, 38 DPR 230 (1925). Asimismo, en *Pueblo v. Tribunal Superior*, 103 DPR 755 (1975), nuestro Más Alto Foro judicial formuló los criterios para determinar si se produjo un desistimiento. A saber, (1) que transcurra un intervalo de tiempo razonable entre el abandono de la actividad criminal y el hecho delictivo, por el cual se le imputa responsabilidad; (2) el lapso de tiempo tiene que ser suficiente para que si hubiera otros participantes, estos tengan la oportunidad de seguir el ejemplo del que se retiró y refrendar su actuación criminal concertada; (3) la comisión del delito por el cual el actor trata de evitar responsabilidad penal debe ser imputable a una causa independiente; (4) la persona que alega haberse arrepentido debe tratar de detener la comisión del delito por parte de los demás.

**E. Delitos de la Ley de Armas**

*a) Portación de armas de fuego sin licencia*

La portación o uso de un arma sin licencia constituye una infracción a la Ley Núm. 168-2019, mejor conocida como la *Ley de Armas de Puerto Rico*, 25 LPRA secs. 461 *et al.* Según esta ley, la portación significa "a la posesión inmediata o la tenencia física de una o más armas de fuego, cargadas o descargadas, sobre la persona del portador o a su alcance inmediato. Por alcance inmediato se entenderá al alcance de su mano y la transportación de las mismas". 25 LPRA sec. 461a (gg). La portación de armas sin licencia está regulada por el Artículo 6.05 de la Ley de Armas, 25 LPRA sec. 466d, que dispone, en lo pertinente, lo siguiente:

> Toda persona que porte, transporte o use cualquier arma de fuego, sin tener una licencia de armas vigente, salvo lo dispuesto para los campos de tiro o lugares donde se practica la caza, incurrirá en delito grave y convicto que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a, o a disfrutar de los beneficios de algún programa de desvío, o a cualquier alternativa a la reclusión reconocida en esta jurisdicción. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.

> Cuando el arma sea una neumática, pistola de o artefacto de descargas eléctricas, de juguete o cualquier imitación de arma y ésta se portare o transportare con la intención de cometer delito o se usare para cometer delito, la pena será de reclusión por un término fijo de cinco (5) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.

> [...]

Un elemento indispensable para la comisión de este delito es la ausencia de autorización gubernamental para portar el arma referida. *Pueblo v. Negrón Nazario*, 191 DPR 720, 752 (2014). La portación ilegal de un arma de fuego se puede evidenciar en el juicio con prueba de que el acusado portó un arma sin permiso; aquí, la evidencia debe demostrar la portación y la ausencia del permiso correspondiente. *Íd.* Por último, el uso que se le dé al arma es

irrelevante para la consumación del delito de portación de armas de fuego. *Íd.* pág. 753.

Por otro lado, es norma reiterada que "la presentación del arma en evidencia no es indispensable en casos de esta naturaleza, si existen otros elementos o circunstancias que demuestran que el acusado la portaba." *Pueblo v. Torres Nieves*, 105 DPR 340, 347 (1976). Esto es una cuestión de "pragmatismo judicial [pues, de lo contrario,] se imposibilitaría todo encauzamiento (sic) y eficacia probatoria [para obtener una convicción] cuando un arma de fuego no es ocupada." *Pueblo v. Acabá Raíces*, 118 DPR 369, 374 (1987).

Asimismo, nuestro ordenamiento jurídico no exige que un testigo sea "mecánico, militar, comerciante o experto en armas de fuego" para identificar correctamente lo que es un arma de fuego. *Pueblo v. Guzmán*, 52 DPR 458, 460 (1938). Lo anterior se debe a que:

> [E]n procesos de posesión y portación de armas, su demostración como elemento de prueba, esto es, datos capaces de contribuir al descubrimiento de la veracidad del hecho delictuoso, no puede depender de la existencia de heridos que no hay, de impactos de bala cuyas trayectorias no los produce ni de casquillos de proyectiles de balas que no están disponibles. *Pueblo v. Acabá Raíces, supra*, págs. 374-375.

Un fallo o veredicto de culpabilidad por este delito se sostiene con la existencia de *prueba clara y convincente* de "otros elementos o circunstancias demostrativa que lleven a la conciencia íntima del juzgador a concluir que el acusado poseía y portaba el arma." *Íd.,* pág. 375; véase, además, *Pueblo v. Olivencia*, 93 DPR 845, 847 (1967).

### b) *Apuntar un arma de fuego*

La Ley Núm. 168-2019, *supra*, penaliza que se apunte o dispare un arma de fuego. Sobre el hecho de apuntar con un arma de fuego a una persona, el Artículo 6.14, 25 LPRA sec. 466m, puntualiza que:

> Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en

casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:

[...]

(b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna.

De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.

Para que se configure el delito de apuntar un arma de fuego, es necesario que esté presente el elemento subjetivo de la intención de apuntar con un arma a una persona en la mente del sujeto activo. Es decir, el apuntar a una persona con un arma de fuego no puede ser un suceso incidental.

Las penas incluidas en la Ley de Armas de Puerto Rico han de cumplirse consecutivamente entre sí y con relación a cualquier otra sentencia. *Pueblo v. Bonilla Peña*, 183 DPR 335, 352 (2011).

**III.**

En síntesis, el apelante nos plantea que procede la revocación del veredicto de culpabilidad emitido por el jurado, así como de la *Sentencia* dictada por el TPI dada la comisión de errores de estricto derecho y otros que versan sobre la apreciación de la prueba. Primeramente, discutiremos aquellos errores sobre cuestiones de derecho.

El señor Vélez Vélez plantea que el TPI incidió al declarar *No Ha Lugar* a la solicitud de absolución perentoria. No le asiste la razón. Nos explicamos.

En el presente caso, el apelante presentó una solicitud de absolución perentoria luego de quedar sometido el caso ante la consideración del jurado. Según surge de la *Minuta* de la vista del 6 de diciembre de 2023, la cual consta en los autos originales, el apelante sostuvo, a través de su representación legal, que ninguno de los testimonios vertidos probaba el elemento de consentimiento para que se configurara el delito de agresión sexual conyugal. Adujo

que, la señora Rivera Alequín declaró que este no tenía el arma para que se configurara la intimidación ni testificó que se negó expresamente a sostener relaciones sexuales con el apelante. Asimismo, sobre la tentativa de agresión sexual conyugal, arguyó que no surgía prueba de alguna causa interventora que interrumpiera la consumación del delito, sino que la prueba fue la manifestación que hizo la señora Rivera Alequín de que no quería tener relaciones íntimas lo que llevó al apelante a desistir.

Por otro lado, sobre los Arts. 6.05 y 6.14 (b) de la Ley de Armas, adujo que no se presentó prueba sobre si el arma de fuego fuera capaz de disparar, capacidad que sostuvo es *sine qua non* para imputar los referidos delitos. También, arguyó que, no existía prueba suficiente de la ilegalidad de la posesión del arma, toda vez que, la búsqueda en el Registro de Armas a través de su nombre no era suficiente para sostener la conclusión que no tenía la licencia para portar el arma.

Por su parte, el Ministerio Público argumentó que los planteamientos del apelante versaban sobre la apreciación de la prueba y no suficiencia, razón por la que no procedía la solicitud de absolución perentoria. Específicamente, arguyó que el consentimiento no podía ser uno voluntario sino producto de intimidación y amenaza. Asimismo, en cuanto a la tentativa de agresión sexual conyugal, sostuvo que la consumación del delito no se ejecutó porque la perjudicada comenzó a gritar, y no porque se trata de un desistimiento. Sobre los cargos por la Ley de Armas, adujo que la jurisprudencia ha reconocido que las circunstancias de un testimonio son suficientes para probar que se tuvo un arma de fuego y se apuntó con ella. Resaltó que, todo lo anterior, eran asuntos de credibilidad que le correspondían al jurado aquilatar, y no asuntos de suficiencia de prueba.

Como expusimos anteriormente, el análisis requerido para la determinación de si procede o no una absolución perentoria estriba en si, como cuestión de derecho, la prueba presentada es suficiente para sostener una convicción y no sobre la apreciación que le merezca un juzgador de hechos a la referida prueba.

Luego de evaluar sosegadamente las posturas de las partes con el beneficio de la transcripción de la prueba oral, colegimos que, el Estado probó los elementos del delito de agresión sexual conyugal y maltrato mediante amenaza, a través del determinante testimonio de la víctima, quien declaró, y así lo creyó el jurado, que el 11 de mayo de 2022, fue sometida por el apelante, su pareja consensual, a un acto sexual bajo intimidación. Específicamente, la señora Rivera Alequín testificó que, luego de tener una prolongada discusión con el apelante, este le dijo que le quitaría la vida, y accedió a sostener relaciones sexuales con este bajo miedo, por haber sido amenazada y porque el señor Vélez Vélez portaba un arma. Procedemos a citar un extracto del testimonio de la señora Rivera Alequín durante su interrogatorio directo:

P.    Sí. Usted ha indicado que el señor Daniel Vélez Vélez entró. Cuando el señor Daniel Vélez Vélez entra, ¿cómo usted lo percibe?

R.    Tenía un arma debajo del, del brazo.

P.    Cuando usted dice que "tenía un arma debajo del brazo", eh, ¿podría describir a las damas y caballeros del jurado cómo era esa arma?

R.    Pequeña y negra.

P.    ¿Cómo usted pudo ver esa arma?

R.    Porque la tenía así.

P.    Una vez él entra, usted ha declarado ya que él le dijo que se bañara. Usted no lo hizo. ¿Qué sucedió?

R.    Pues él me preguntaba que, qué yo le hacía íntimamente a mis parejas.

P.    ¿Por qué él le preguntaba eso?

R.    Porque él quería tener relaciones conmigo. Y me obligaba a que yo le dijera qué yo hacía con otros hombres. Y apuntaba a la cama si yo no le decía que, lo que yo hacía con otras parejas.

P.      Cuando usted dice que "él apuntaba hacia la cama", ¿en ese momento dónde usted se encontraba?

R.      En el cuarto.

P.      ¿En qué lugar del cuarto?

R.      En la cama.

P.      Le pregunto, eh, ¿cuánto duró este suceso de la discusión?

R.      Hasta el amanecer, la madrugada.[90]

La señora Rivera Alequín continuó relatando que la discusión sobre unas fotos contenidas en su celular se prolongó hasta las siete (7) de la mañana, cuando sus hijas menores de edad se iban a la escuela. Asimismo, indicó que el señor Vélez Vélez llevaba el arma en su muslo derecho y apuntaba hacia la cama. De igual manera, que, en ese momento, el apelante la amenazó y sostuvo relaciones sexuales. Procedemos a citar sus palabras, según surgen de la transcripción, y según fueron escuchadas por el jurado:

P.      ¿Qué sucede una vez usted se da cuenta porque sus niñas se iban para la escuela? ¿Qué pasó?

R.      Me llamaron, a decirme que ya se iban para la escuela. Él me dijo "ahora que las nenas no están, este, te voy, te voy a quitar la vida", me dijo.

P.      ¿Cómo usted se sintió cuando el señor Daniel Vélez Vélez le dijo eso?

R.      Con miedo, temor.

P.      ¿Qué sucedió luego de que el señor Daniel Vélez Vélez le dice eso?

R.      Pues yo voy al baño, me meto a bañar. Este, hubo un acto sexual.

P.      Cuando usted dice que "hubo un acto sexual", ¿podría explicarle a las damas y caballero cómo fue eso?

R.      Pues él tuvo relaciones anales conmigo y a la fuerza. Y yo le indico que me está lastimando. Y, y él me dijo pues, que no iba a tener relaciones conmigo porque yo estaba llorando.

P.      ¿Por qué usted dice eh, que fue a la fuerza?

R.      Porque yo no quería.

P.      ¿Qué usted le expresó al señor Daniel Vélez Vélez para dejarle saber que no quería?

R.      No recuerdo.

---

[90] TPO, págs. 114 y 115, líneas 21-31 y 1-11.

P.       No hay problema. ¿Por qué usted accedió, o, o tuvo relaciones sexuales con el señor Daniel Vélez Vélez?

R.       Porque tenía el arma, estaba el arma en mi cuarto y, pues yo tenía miedo y tenía que acceder porque ya él me había amenazado.

[...]

P.       Ok. Eh, usted ha indicado, verdad, la pregunta que le estaba haciendo era ¿por qué había accedido?, y usted estaba contando el por qué. ¿Podría continuar por qué accedió a tener relaciones sexuales?

R.       Por miedo.

P.       ¿Miedo a qué?

R.       A que me fuera a hacer daño.

P.       Una vez usted, verdad, indica que tuvieron relaciones sexuales. ¿Podría explicar cómo fue ese acto?

R.       Fue brusco. Me lastimó-estaba lastimando.

P.       Cuando usted dice "que la estaba lastimando", ¿a qué usted se refiere?

R.       Que el acto sexual se llevó a cabo, este, bruscamente, que no, no, no fue porque yo lo quise.

P.       ¿Cuáles eran sus deseos de tener relaciones sexuales con el señor Daniel Vélez Vélez en ese momento?

R.       No, no tenía deseos. . . .[91]

Como vimos, a través del testimonio de la perjudicada, el Ministerio Público pasó prueba de los elementos del delito de agresión sexual conyugal, a saber: (1) que el señor Vélez Vélez compelió a la señora Rivera Alequín a sostener una relación sexual no consentida, (2) mediante el empleo de intimidación o amenaza de grave daño corporal. A su vez, se presentó la prueba correspondiente a los elementos que requiere el maltrato mediante amenaza tipificado en el Art. 3.3 de la Ley 54, *supra,* que indica que toda **persona que amenazare con causarle daño** a su cónyuge, excónyuge, a la persona con quien cohabita, o con quien haya cohabitado o **con quien sostiene o haya sostenido una relación consensual** [...] incurrirá en delito grave de cuarto grado en su mitad superior.

---

[91] *Íd.,* pág. 117, líneas 15-29.

Igualmente, a través del testimonio de la señora Rivera Alequín, el Ministerio Público presentó evidencia suficiente sobre la tentativa de agresión sexual conyugal. Surge de la declaración de Rivera Alequín que, en diciembre de 2021, el señor Vélez Vélez llevó a cabo actos inequívocos e inmediatamente dirigidos a cometer un acto sexual que, tras el grito de la víctima, no se consumó. Citamos un extracto del testimonio de la señora Rivera Alequín:

P.    Una vez usted dice que fue trasladada a ese hogar seguro, eh- voy a retirar esa pregunta. Señora Rivera, le pregunto, para el mes de diciembre de 2021, ¿qué sucedió si algo con el señor Daniel Vélez Vélez?

R.    Él me apuntó con un arma. Este, yo estaba acostada en la cama, y me agarró, así, a la fuerza y me, me apuntó. Eh, y yo le dije, "déjame, déjame".

P.    Vamos por-

R.    Y comencé a gritar.

P.    Perdone que la interrumpa. Usted ha dicho que el señor Vélez Vélez la apuntó. ¿Con qué le apuntó?

R.    Con un arma.

P.    Me dijo que estaba acostada. ¿Podría explicarle, describirle al jurado cómo era que usted estaba?

R.    Acostada y me agarró por la ropa interior. Porque quería tener relaciones, a las malas.

P.    Usted ha dicho- usted ha dicho que él tenía un arma. ¿Podría describir esa arma?

R.    Negra y pequeña.

P.    Ha dicho que le agarró por la ropa interior porque ten- quería tener relaciones sexuales. ¿Qué sucede una vez pasa eso?

R.    Pues, él me suelta.

P.    ¿Por qué él la suelta?

R.    Porque como me escuchó gritar, pues me soltó. Y me dijo que no lo iba a volver a hacer.

P.    Usted dice-

R.    Él se disculpó, como que no, no me iba a volver a hacer eso.

P.    Ha dicho que usted comenzó a gritar. Eh, cuando usted dice gritar, ¿podría explicar cómo eran esos gritos?

R.    Fue bastante alto. Y una de mis niñas.[92]

---

[92] *Íd.,* págs. 128 y 129, líneas 25-31 y 1-20.

La señora Rivera Alequín continuó testificando sobre cómo el señor Vélez Vélez le apuntó con el arma en ese evento ocurrido en diciembre de 2021. En particular surge de la transcripción que, a solicitud del Fiscal, la testigo se puso de pie y describió ante el jurado cómo fue que él apuntó. Contestó "como, así como pa (sic) donde mi".[93]

Al argumentar su solicitud de absolución perentoria, el apelante intentó demostrar que la tentativa imputada fue, en realidad, un desistimiento de su parte. No obstante, esa distinción no es un asunto de derecho sino de apreciación de la prueba, por lo que tampoco procedía la absolución perentoria por ese fundamento.

En garantía de su derecho constitucional a carearse con la prueba presentada en su contra, el señor Vélez Vélez tuvo la oportunidad de confrontar a su acusadora sobre su testimonio e intentar impugnar la credibilidad de su relato. Sin embargo, el jurado creyó el testimonio de la señora Rivera Alequín y apreció lo ocurrido en diciembre de 2021 como una tentativa de agresión sexual conyugal.

Asimismo, surgen del testimonio de la perjudicada los elementos necesarios para imputar el delito de apuntar con un arma de fuego. Durante su relato sobre los dos eventos que dieron lugar a las acusaciones, la señora Rivera Alequín declaró que el apelante portaba un arma negra y pequeña, y describió cómo éste apuntó la misma hacia ella.

De igual forma, el testimonio de la agente Cancel, junto con el Exhibit 1 (el resultado negativo de la búsqueda en el Registro de Armas), demostraron los elementos sobre la portación ilegal de la referida arma. El planteamiento de que la búsqueda del apelante en el Registro de Armas a través de su seguro social hubiera sido más determinante para probar su culpabilidad más allá de duda

---

[93] *Íd.* pág. 130, líneas 11-18.

razonable de portar el arma sin licencia, es un asunto de apreciación de la prueba que solo le competía al juzgador de los hechos y no tiene cabida dentro del análisis de la absolución perentoria.

Como vimos, el examen requerido para determinar si procede una solicitud de absolución perentoria, se basa únicamente en aquilatar la suficiencia de la prueba para sostener una acusación y sin la cual el juzgador de los hechos, irrespectivamente de si la adjudica creíble o no, no puede hallar culpable al acusado. Cónsono con lo anterior, la prueba se entenderá insuficiente cuando, aun siendo creída por el juzgador de los hechos, no establece los elementos del delito imputado.

Siendo ello así, y conforme lo permite la Regla 135 de Procedimiento Criminal, *supra*, R. 135, el TPI actuó correctamente al reservar su resolución antes de someter el caso a la consideración del jurado, y luego decretar *No Ha Lugar* a la solicitud según presentada.

Procedemos atender, el error señalado sobre la prueba potencialmente exculpatoria. El señor Vélez Vélez aduce que, el TPI debió desestimar los cargos de la Ley de Armas, *supra*, toda vez que, el Ministerio Público no entregó, como parte del descubrimiento de prueba, unos documentos a los cuales se hizo referencia durante el juicio. En específico, un informe que aduce, debió producirse del análisis hecho por la División de Crímenes Cibernético al celular de la señora Rivera Alequín y un memo que contenía el seguro social del apelante, el cual fue utilizado para la búsqueda en el Registro de Armas. Asimismo, arguye que la referencia hecha sobre lo antedicho durante el juicio fue sorpresiva y lesionó su debido proceso de ley al socavar su derecho a una defensa adecuada.

De entrada, no le asiste la razón al indicar que se trató de prueba sorpresiva. Un análisis del expediente refleja que, los documentos a los cuales hace referencia el apelante no fueron

presentados ni ofrecidos como prueba. Inclusive, surge del expediente que, ante el planteamiento hecho por la defensa sobre el referido documento, el TPI indicó que el Ministerio Público no lo ofreció en evidencia y que, de haberse ofrecido, no hubiera permitido que se admitiera. Igualmente, el foro de instancia precisó que el documento admitido se manejaría frente al jurado de tal modo que entendiera que solo existía ese documento.[94] Siendo así, los presuntos otros documentos a los que alude el apelante no fueron parte de la prueba que el jurado analizó para determinar su culpabilidad.

En segundo lugar, somos del criterio que, el apelante no nos ha puesto en posición para determinar que procede la revocación del veredicto y la sentencia por las razones antes resumidas. Como expusimos previamente, el acusado que alega un perjuicio a su debido proceso de ley por no habérsele sido descubierta prueba potencialmente exculpatoria, tiene que demostrar que: (1) la prueba no está disponible por acción u omisión del Ministerio Público, (2) que la prueba era pertinente; y que (3) hubiera obrado a favor del acusado.

En el presente caso, el jurado consideró que la prueba de la falta de licencia del apelante para portar armas de fuego se basaba únicamente en su nombre y no en su seguro social, pues ello fue objeto de amplia discusión durante el contrainterrogatorio de la agente Rosado Arroyo. Por tanto, su planteamiento va dirigido, más bien, a la apreciación que le mereciera un juzgador a la referida prueba y no a un asunto sobre prueba exculpatoria. La postura esbozada por el apelante sobre cómo mediante el memo (que presuntamente acreditara la falta de licencia de armas e incluyera el número de seguro social del apelante) hubiera podido ayudarlo en su defensa porque el antedicho número está ligado a su nombre, no

---

[94] *Minuta* del 5 de diciembre de 2023, pág. 2.

nos persuade. Añádase que, el apelante tampoco logró establecer que el foro primario se haya extralimitado de los parámetros de su discreción o haya cometido un error manifiesto al entender sobre dicho planteamiento.

Igualmente, el propio apelante sostiene que el informe de la División de Crímenes Cibernéticos sobre el celular de la señora Rivera Alequín era uno que **se debió preparar**. Por consiguiente, de su propio planteamiento, el apelante reconoce que no es certero que el referido documento efectivamente existió y, por acción u omisión del Estado, no le fue provisto al señor Vélez Vélez. De hecho, a preguntas de la representación legal del apelante durante su contrainterrogatorio, la agente Rosado indicó que de la División de Crímenes Cibernéticos no surgió ninguna información relacionada a un análisis del celular de la señora Rivera Alequín, razón por la cual no se le entregó al Ministerio Público ningún documento. Procedemos a citar el extracto del contrainterrogatorio al que hacemos referencia:

P. Lo cierto es que, como parte de su investigación, usted no, no registró el teléfono de doña Yazmin para ver si la llamada que había generado Daniel se había hecho, ¿verdad que no?

R. Ese teléfono se llevó a crímenes cibernéticos.

P. La pregunta es, ¿si usted registró el teléfono, a ver si se había re- generado la llamada?

R. Tuve la oportunidad de llevarlo a crímenes cibernéticos.

P. Sí, usted tuvo la oportunidad de ir a crímenes cibernéticos men- Le pregunto, eso es un dato bien importante, ¿verdad que sí?

R. Cierto.

P. ¿Usted tampoco lo hizo constar en el "*exhibit*" número 2 del Ministerio Público?, ¿verdad que no? [sic]

R. No.

P. ¿Y usted dice que esa era parte de su investigación?

R. Es parte de la investigación.

P. Y no lo manifestó, ¿verdad que no?

R. No.

P.      No. ¿No hay algún documento que haya expedido en relación a crímenes de- cibernéticos? Ese documento usted no lo investigó, ¿verdad que no?

R.      De surgir alguna información, se entrega a Fiscalía.

P.      ¿Verdad que no? O sea, que no surgió nada, ¿verdad que no?

R.      De surgir información, se entrega a Fiscalía.

P.      De surgir información. ¿Quiere ecir que no surgió información? ¿[V]erdad que no?

R.      El Ministerio Público pues, no tiene la información, no- Ellos, si se entrega, si

P.      Y usted acaba de manifestar que si-

R.      -si crímenes cibernéticos, consigue información, le entregamos al Ministerio Público.

P.      Exacto. En este caso no surgió ninguna, ¿verdad que no?

R.      No.[95]

Como surge de su testimonio, la agente Rosado indicó que el documento al cual hace referencia el apelante no existió. De ese modo, no puede aducirse que el Ministerio Público ocultó, de mala fe o negligentemente, prueba potencialmente exculpatoria. Como es sabido, "[s]e requiere alguna demostración afirmativa de la existencia de esa prueba y no la serie de especulaciones que alimentan el argumento de la defensa." *Pueblo v. Romero Rodríguez,* 112 DPR 437, 440 (1982). Somos del criterio que dicha demostración no ha sido satisfecha en el presente caso.

Por otro lado, el apelante sostiene que el TPI incidió al no impartir una instrucción al jurado sobre un arma neumática toda vez que el Ministerio Público no presentó prueba suficiente sobre la portación de un arma de fuego. Sabido es que, en nuestra jurisdicción, las instrucciones al jurado constituyen el mecanismo procesal mediante el cual los miembros del jurado toman conocimiento del derecho aplicable al caso. *Pueblo v. Rodríguez Vicente,* 173 DPR 292, 297-298 (2008). En vista de que el jurado, de ordinario, está compuesto de personas desconocedoras de las

---

[95] TPO, págs. 67 y 68, líneas 24-30 y 1-24.

normas jurídicas vigentes en nuestro ordenamiento jurídico, el juez que preside el proceso tiene el deber ineludible de instruir a los miembros del jurado sobre el derecho aplicable y de velar que las instrucciones impartidas sean correctas, precisas y lógicas. *Íd.*

Cónsono con lo anterior, "el acusado tiene derecho a que se le transmita al jurado todos los aspectos de derecho que, bajo cualquier teoría razonable, pudieran ser pertinentes en las deliberaciones, ello, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad." *Íd.,* pág. 298. No obstante, solo procederá impartir las instrucciones al jurado cuando la prueba lo justifique. *Íd.*

Sin embargo, es conocido que una instrucción errónea u una omisión en una instrucción impartida, no acarrea la revocación de un veredicto de culpabilidad si el error es uno no perjudicial o un "*harmless error.*" Por lo tanto, si no se demuestra que, de no haberse cometido el error, el jurado hubiera emitido un veredicto distinto, no se revocará la presunción de que el veredicto fue emitido conforme a la prueba presentada. *Pueblo v. Torres Rodríguez,* 119 DPR 730, 740 (1987); véase, además, *Pueblo v. Prados García,* 99 DPR 384, 394 (1970).

Esencialmente, el señor Vélez Vélez basa su señalamiento en que no se probó la portación del arma de fuego y que, de haberse impartido la instrucción, el jurado hubiera podido concluir que el arma era de otro tipo. Lo anterior no nos persuade, toda vez que, como expusimos anteriormente, nuestro Tribunal Supremo ha resuelto que el delito de portación ilegal de un arma de fuego se sostiene con prueba clara y convincente de "otros elementos o circunstancias demostrativas que lleven a la conciencia íntima del juzgador a concluir que el acusado poseía y portaba el arma." *Pueblo v. Acabá Raíces, supra.* De igual forma, de la Minuta del 6 de diciembre de 2023, surge que el TPI le impartiría una instrucción al

jurado de que podían "**considerar si existen otros elementos o circunstancias demostrativas que les permita concluir que la persona poseía o portaba**".[96]

Toda vez que no se presentó el arma físicamente en evidencia, colegimos que la referida instrucción impartida por el TPI resulta suficiente. Recordemos que "lo que parece confuso en una instrucción puede haber sido aclarado en otra instrucción, mientras lo que parece omitido en una instrucción puede haber sido incluido en otra." E. L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Ed. Forum, 1991, Vol. II, Sec. 15.8, pág 341. En otras palabras, en base a la instrucción, el jurado bien podía haber determinado que el señor Vélez Vélez portaba un arma de fuego, una neumática, una de juguete, o inclusive, ninguna de las anteriores.

Superado lo anterior corresponde atender los señalamientos sobre la apreciación de la prueba presentada. El apelante señala que, el Ministerio Público falló en probar los elementos de los delitos imputados y la conexión con el apelante por lo que a su entender el jurado erró al hallarlo culpable de los delitos imputados sin que se probara más allá de duda razonable su culpabilidad.

Específicamente, plantea que el jurado incidió al hallarlo culpable de cometer agresión sexual conyugal y su tentativa sin que se evidenciaran todos los elementos de los delitos, y cuando la prueba reflejó un desistimiento. De igual forma, que el jurado se equivocó al encontrarlo culpable de cometer los delitos bajo la Ley de Armas cuando no se demostraron los elementos de los delitos, toda vez que, no se probó que el arma fuera capaz de disparar un proyectil. Arguyó que la investigación fue en extremo "un trabajo deficiente" sin evidencia ni corroboración de la información brindada. Puntualizó que, no se realizaron entrevistas a otras

---

[96] Véase Minuta del 6 de diciembre de 2023. Énfasis nuestro.

personas y, en ausencia de un *rape kit* para probar la penetración anal, no se corroboró si, en efecto, el alegado acto sexual ocurrió.

Por su parte, la parte apelada puntualizó todos los elementos de los delitos imputados y la suficiencia de la prueba presentada por el Ministerio Público. En esencia, destacó el valor probatorio y la credibilidad conferida por el jurado a los testimonios presentados, particularmente la de la Señora Rivera Alequín, que coincide con lo testificado por la Agente Rosado Arroyo. Arguyó que, el apelante tuvo amplia oportunidad para confrontar la prueba, sin embargo, no logró persuadir al jurado e impedir que el Ministerio Público probara, más allá de duda razonable, la culpabilidad del apelante en todos los cargos presentados en su contra.

Tras evaluar sosegadamente la totalidad del expediente con el beneficio de la transcripción, constatamos que, el Ministerio Público presentó prueba suficiente para sustentar cada uno de los elementos de los delitos imputados y su conexión con el señor Vélez Vélez, a satisfacción del *quantum* de prueba exigido en el presente caso, esto es, más allá de duda razonable. Recordemos que, esta no es una duda especulativa, imaginable, ni cualquier duda posible, sino "aquella duda fundada que surge como producto de todos los elementos de juicio involucrados en el caso." *Pueblo v. Irizarry,* 156 DPR 780, 788 (2002). En otras palabras, la insatisfacción de la conciencia del juzgador con la prueba presentada. *Íd.*

En el presente caso, mediante el testimonio de la señora Rivera Alequín, esta detalló por qué se sintió amenazada e intimidada por el apelante, cómo ocurrieron tanto el acto sexual al cual se sintió compelida a sostener con éste, como el evento en el que este intentó agredirla sexualmente, y describió el arma que portaba el señor Vélez Vélez el cual utilizó para apuntar a la señora Rivera Alequín durante los hechos correspondientes a los delitos imputados. En este caso el jurado tuvo el beneficio de evaluar la

prueba directa que consistió en el testimonio de la propia víctima mediante el cual señaló al apelante como el responsable de cometer los actos delictivos en su contra y describió cómo, dónde y cuándo los cometió así como los efectos sobre ella. Ello, junto a los testimonios de los agentes y la totalidad de la prueba admitida fueron suficientes para que el jurado apreciara, valorara y determinara que, más allá de duda razonable, el apelante cometió todos los elementos de los delitos imputados.

Con relación a la disyuntiva sobre si el arma era o no capaz de disparar, tampoco nos persuade la postura del apelante. A su entender, de haber conocido con certeza matemática si el arma no tenía esa capacidad, el jurado hubiera llegado a un veredicto distinto. Nótese que, esta controversia fue objeto de amplia discusión durante el contrainterrogatorio de la agente Rosado Arroyo, por lo que dicho asunto fue presentado para la consideración del jurado. Sin embargo, resulta evidente que, al aquilatar el valor probatorio, el jurado no apreció que lo antes resultara en una duda razonable para no encontrar culpable al señor Vélez Vélez.

Por otro lado, la determinación de si ocurrió una tentativa o un desistimiento, es un asunto de credibilidad y apreciación de la prueba. Es meritorio señalar que, el foro primario le impartió instrucciones al jurado sobre tentativa y desistimiento de agresión sexual conyugal.[97] Es decir, el jurado evaluó si lo que ocurrió fue una tentativa o un desistimiento del referido delito y no encontramos ningún criterio que nos mueva a intervenir con su adjudicación.

De igual forma, en cuanto a la postura del apelante sobre las deficiencias en la investigación y la ausencia de un *rape kit,* constatamos que, dichos cuestionamientos constituyen asuntos que el jurado pudo considerar a través de la confrontación a la prueba

---

[97] *Íd.,* págs. 5-6.

realizada por la defensa, en aras de convencer al jurado sobre su teoría del caso y minar la credibilidad de la prueba, presentada por el Ministerio Público. Evaluado lo antes, sostenemos que, en la etapa apelativa dichas consideraciones no resultan suficientes para lograr que esta Curia se aparte de la norma de abstención de intervenir en la apreciación de la prueba en este caso. Lo determinante en el presente caso ha sido que el jurado le adjudicó alto valor probatorio y credibilidad a la prueba desfilada y en particular, el testimonio de la señora Rivera Alequín. Igualmente, le merecieron credibilidad los testimonios de los agentes del orden público.

Al justipreciar los asuntos presentados ante nuestra consideración colegimos que, no se desprende que haya mediado pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba que el Jurado tuvo ante sí, por lo que no intervendremos con su criterio. En su consecuencia concluimos que, no se cometieron los errores señalados por el señor Vélez Vélez.

**IV.**

Por los fundamentos antes expuestos, se confirma la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones